UNITED STATES of America, Appellee,

v.

Nathaniel SCHLESINGER, Appellant.

No. 569, Docket 78–1375.

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 1979.

Decided April 19, 1979.

Edward R. Korman, U. S. Atty. for the Eastern District of New York, Brooklyn, N. Y. (Douglas K. Mansfield, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Harold R. Tyler, Jr., New York City (Patterson, Belknap, Webb & Tyler, New York City, Rudolph W. Giuliani, Michael B. Mukasey, and Kenneth A. Caruso, New York City, of counsel), for appellant.

Before LUMBARD, FEINBERG and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Schlesinger appeals from his conviction for obstruction of justice after a jury trial before Judge Platt in the Eastern District of New York. Finding no merit in Schlesinger's claims that his indictment was based on inadequate evidence and that he was prejudiced by the trial judge's charge to the jury, we affirm the conviction.

Schlesinger's indictment and conviction grew out of the arrest of one Eliezer Veiss for smuggling in November of 1977. Veiss, an Israeli citizen, was arrested upon arriving at Kennedy Airport from Israel after a search by customs officials disclosed that he was carrying a large quantity of diamonds. Though Veiss did not speak English, he had represented both orally through an interpreter and in a written statement to customs officials that he was not carrying property that required declaration.

Schlesinger's connection with Veiss apparently developed after certain members of the Hasidic community in Williamsburg requested that he help Veiss defend himself against the smuggling charge. Schlesinger agreed and as a first step arranged for Veiss to be represented by attorneys Milton Gould and Thomas Andrews.

In December of 1977, Gould and Andrews met with David Trager, then the United States Attorney for the Eastern District and two of his assistants, Bernard Fried and Shira Scheindlin. It was agreed at the meeting that Veiss would submit to a polygraph examination so as to determine his state of mind at the time he attempted to enter the United States with the diamonds. The polygraph test was to be administered by an examiner agreeable to both sides and it was also agreed that its results were not to be admissible in court but were simply to aid the Government in deciding whether to prosecute Veiss.

In its search for a suitable examiner, the Government contacted James Keefe, whose firm Truth Verification, Inc., had previously done work for the United States Attorney's office. Keefe in turn recommended his co-partner Jessiah Jacobson, who, with the assistance of his brother Hirsch, could administer an exam in both Yiddish and Hebrew.

Jacobson proved acceptable to both sides and the examination was scheduled for the morning of December 29, 1977 in Jacobson's office at Truth Verification, Inc. What occurred at the examination and immediately thereafter was hotly contested at trial. According to the testimony of the Government's witnesses, Veiss was given the exam twice, first in Yiddish and then in Hebrew. Convinced by the end of the test that Veiss' answers were dishonest, Jessiah Jacobson went into Keefe's office and telephoned his conclusions to Special Agent Frederick Abbatiello, the customs officer assigned to Veiss' case. After returning to his own office, Jacobson, along with his brother Hirsch, explained to Veiss that he had failed the test.

While the Jacobsons were speaking to Veiss they noticed a man's shadow on the door, his ear pressed to the glass. The man was Schlesinger and, with Veiss' permission, the Jacobsons brought him into the room. Schlesinger introduced himself and explained that he was a go-between for persons of the Hasidic community having dealings with government agencies. He argued

that Veiss could not have intended to smuggle the diamonds since the duty on their invoice value of $19,000 would only have been about $500. When Jessiah Jacobson suggested that the value of the diamonds was in fact much higher than $19,000, Schlesinger offered to place a call to his brother-in-law who was in the diamond business. The call only confirmed Jacobson's opinion, however, since Schlesinger's brother-in-law indicated that one of the diamonds alone was worth $25,000.

Failing in his attempt to persuade Jacobson that Veiss was telling the truth, Schlesinger nevertheless urged him to report to the United States Attorney's office that Veiss had passed the test. When Jacobson rejected Schlesinger's suggestion that he submit the false report for the sake of the Jewish community, Schlesinger switched to more tangible inducements, offering first to let Jacobson purchase the diamonds at the invoice price of $19,000, and later to pay Jacobson $25,000 for a favorable report. Though Jacobson declined both offers, Schlesinger continued to urge that he falsify his report. Finally, and only because he had another appointment to go to and needed to get Schlesinger out of his office, Jacobson stated that he would think about Schlesinger's offers and that Schlesinger should come back later that afternoon.

When Schlesinger and Veiss departed, the Jacobsons went to Keefe's office and reported to him the details of Schlesinger's proposals. Jessiah Jacobson then called the United States Attorney's office but was told that Assistants Fried and Scheindlin were out to lunch. Before leaving he asked Keefe to continue calling that afternoon. Though Keefe placed a number of calls, he also was unable to reach either Fried or Scheindlin.

Jessiah Jacobson returned to his office at about 5:00 P.M. and found Schlesinger and Veiss waiting for him. Schlesinger promptly resumed his earlier attempts to persuade Jacobson to submit a favorable report, this time indicating that Jacobson could get $10,000 right away at Schlesinger's office. Jacobson thereupon excused himself, went

into Keefe's office and placed a call to the United States Attorney's office. He advised Fried of Schlesinger's offer to pay $10,000 for a favorable report. Fried asked Jacobson if he would be willing to cooperate with the Government, and when Jacobson said that he would, Fried instructed him to go along with Schlesinger and pretend to accept the offer. Fried then arranged for customs agents to set up surveillance around Schlesinger's place of business at 50 Wallabout Street.

When Jacobson returned to his office he told Schlesinger, in accordance with Fried's instructions, that he would accept the $10,000. Schlesinger, Jacobson, Keefe and Veiss then went to Schlesinger's car and drove to 50 Wallabout Street. Inside, they went to Schlesinger's personal office where Schlesinger took $10,000 out of his safe and gave it to Jacobson. After Jacobson and Keefe had a brief tour of the premises, Schlesinger drove them back to their offices. Once there Jacobson called Fried who directed customs agents to pick up the bribe money.

Schlesinger's version of the events surrounding Veiss' polygraph exam contrasts sharply with the Government's. According to his testimony, Schlesinger accompanied Veiss to the offices of Truth Verification, Inc. on the day of the polygraph exam. Remaining outside in a waiting area while Veiss entered the room in which the exam was to be given, Schlesinger after a few minutes heard Jessiah and Hirsch Jacobson shouting at Veiss in "Jewish," telling him that smuggling was "a very big sin" and a "disgrace" and that Veiss would "rot in jail." Despite this abuse, Schlesinger waited outside the exam room for almost an hour until the test was over. When Jessiah Jacobson finally emerged from the exam room he informed Schlesinger that he didn't believe Veiss was telling the truth. Schlesinger responded that Veiss must have been upset by what he had been put through and he asked Jacobson to conduct a second test once Veiss had calmed down. Jacobson allegedly replied that he "didn't do anything unless he got paid for it," but might per-

form another test if he were allowed to purchase the diamonds for $19,000. Though Schlesinger denied having any authority to sell Jacobson the diamonds, Jacobson nevertheless suggested that he come back at 3 o'clock and he would see what he could do about conducting a second test.

According to Schlesinger, when he returned to Jacobson's office later that afternoon, Jacobson stated that he would make the test if Schlesinger paid him $10,000. Schlesinger reluctantly agreed, and because of Jacobson's insistence that he be paid right away, drove with him to his office at 50 Wallabout and turned over the money. Schlesinger testified further, that despite his request that another test be made, Jacobson stated that it was unnecessary because "I have to make up the reports, whatever I put in the report that is what counts."

In contending that his conviction must be overturned, Schlesinger acknowledges, as he must, that the jury was entitled to reject his explanation for the $10,000 payment and to credit the testimony of the Government's witnesses. Though Schlesinger also concedes that there was more than enough evidence to support his conviction, his first argument on appeal is that the evidence underlying his indictment was inadequate and that its dismissal is required either by virtue of the Grand Jury Clause of the Fifth Amendment or as an exercise of this court's supervisory powers over the administration of justice.

Schlesinger was initially charged in a three count indictment which also named Eliezer Veiss. Count one of this indictment contained a long and detailed narrative of the evidence and charged Veiss and Schlesinger with conspiracy to defraud the United States. Count two of the indictment repeated the allegations of count one and then charged the defendants with obstruction of justice. The third count charged Schlesinger with being an accessory after the fact to the smuggling offense on which Veiss had initially been charged.

On April 26, 1978, some months after the indictment against Schlesinger and Veiss

was returned, the Government, because of its doubts as to the competency of Veiss to stand trial, moved to sever his trial from that of Schlesinger. On the morning of May 8, 1978, the date scheduled for Schlesinger's trial, the Government moved to dismiss counts one and three of the indictment and proceed against Schlesinger solely on the obstruction of justice charge in count two. The trial judge granted the motion to dismiss and indicated, moreover, that because he considered the first paragraph of count two, which simply repeated the allegations of count one, to be mere surplusage, he would not read it to the jury.

Schlesinger's counsel objected to the trial judge's proposed editing of count two, arguing that it had to be presented to the jury in the same form in which the grand jury had voted on it. In response, the trial judge indicated that he would read to the jury all of count two, but would instruct it that the conspiracy alleged in the first paragraph "is not involved. It's just a matter of descriptive material." Schlesinger's counsel, however, objected to this proposal as well, and the Assistant United States Attorney who was to try the case, also expressing concern over the procedure to be followed, suggested the possibility of a superseding indictment. The trial judge approved and gave the Government until 2:00 P.M. to produce a superseding indictment.

Since the grand jury that had voted the original indictment against Schlesinger had been dismissed, the superseding indictment was presented to a grand jury unfamiliar with the case. Assistant United States Attorney Fried, who had obtained the original indictment against Schlesinger, recounted to the grand jury the allegations of that indictment and explained that a superseding indictment was needed to omit the surplus language in count two. After indicating that he had the transcripts of the testimony of the witnesses before the earlier grand jury, Fried summarized that testimony and then offered to have the transcripts read to the grand jury. The grand jury foreman declined this invitation, however, and after Fried had left the room, the

grand jury voted the superseding indictment.

■ Schlesinger's argument that his superseding indictment violated the Grand Jury Clause of the Fifth Amendment is foreclosed by *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956) where the Court stated that:

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for [a] trial of the charge on the merits. The Fifth Amendment requires nothing more."

The broad language of *Costello* was reaffirmed in *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and has been reflected in numerous decisions of this court. *See, e. g., United States v. Mangan,* 575 F.2d 32 (2 Cir. 1978); *United States v. Marchand,* 2 Cir., 564 F.2d 983, *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Bertolotti,* 529 F.2d 149 (2 Cir. 1975); *United States v. Ramsey,* 315 F.2d 199 (2 Cir. 1963). Though it is true that Fried's summary to the grand jury of prior grand jury testimony was at best hearsay, the indictment was unquestionably valid on its face, and thus the Fifth Amendment does not require that we look behind it to consider the character of the evidence upon which it is based.[1]

■ Schlesinger also argues, however, that this court must dismiss his indictment as an exercise of its supervisory powers over the administration of justice. In *United States v. Estepa,* 471 F.2d 1132 (2 Cir. 1972), we held that an indictment must be dismissed pursuant to the court's supervisory powers where there is a high probability that the grand jury would not have indicted if presented with first-hand testimony rather than hearsay or where the prosecution has misled the grand jury as to the "shoddy merchandise they are getting." Neither of the conditions laid down in *Estepa* is met in this case, however. There is not the slightest doubt that the grand jury would have voted the superseding indictment if it had had, not a summary of their testimony, but the witnesses themselves before it. Nor is there any question but that the grand jurors were aware of the nature of the evidence before them and, indeed, were told explicitly that they could "seek something better if they wish." *Estepa* at 1137. In short, this case presents no occasion for the court to invoke its supervisory powers and order an indictment dismissed. The concededly unorthodox procedure used to obtain the superseding indictment, although generally inappropriate, was to some extent forced upon the Government by exigent circumstances and the persistence of appellant's trial counsel, and, in any event, did not result in the slightest prejudice to Schlesinger.

Schlesinger also raises a number of objections to the trial court's charge to the jury. The first two relate to the defense of entrapment, raised by Schlesinger at trial and based on his contention that his $10,000 payment to Jessiah Jacobson was instigated by Jacobson. Schlesinger challenges the trial court's failure to instruct the jury that Jabocson was, as a matter of law, an agent for the government, and also the trial court's instruction as to the inducement required to constitute entrapment.

■ The short answer to Schlesinger's complaints regarding the court's charge on entrapment is that the defense of entrapment was not available to him. Viewing the facts in the light most favorable to Schlesinger, and thus accepting that Jacobson was an agent of the government and solicited the payment from Schlesinger,

---

1. As support for his Fifth Amendment argument, Schlesinger points to *United States v. Hodge,* 496 F.2d 87 (5th Cir. 1974), where a panel of the Fifth Circuit held that a prosecutor's unsworn summary of testimony before an earlier grand jury could not support a superseding indictment. While we note that *Hodge* may be distinguishable since in the present case the grand jury was expressly given the opportunity to inspect transcripts of the witnesses' testimony, we believe that the decision is in any event inconsistent with *Costello* and *Calandra.*

there is still no basis for an argument that Schlesinger was entrapped. According to Schlesinger, Jacobson sought the $10,000 payment for his own corrupt purposes and not as evidence for the Government against Schlesinger. Such a claim of extortion precludes the defense of entrapment. As we stated in *United States v. Kabot,* 295 F.2d 848, 854 (2 Cir. 1961):

> Entrapment involves the action of overzealous government agents acting for the government inciting an innocent man to crime. Extortion on the other hand is based on conduct by dishonest employees attempting action against the government.

Schlesinger's final argument is that the trial judge failed to balance his charge that a defendant's interest in the case may affect his credibility as a witness with an instruction that the defendant's interest is not inconsistent with the ability to tell the truth. As Schlesinger points out, we have held that it is preferable for the trial judge to include a balancing instruction where the charge suggests that a defendant's credibility may be affected by his vital interest in the case. *United States v. Rucker,* 586 F.2d 899 (2 Cir. 1978); *United States v. Floyd,* 2 Cir., 555 F.2d 45, *cert. denied,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977). While we do not retreat from that view in this case, and, indeed, question the need for any instruction as to the effect the defendant's interest may have on his credibility, we do not believe that the trial judge's failure to include the balancing instruction was, in the present circumstances, reversible error. We note firstly that the trial judge's charge did contain some balancing language, instructing the jury that "a defendant's testimony is to be judged in the same way as any other witness." In addition, Schlesinger raised only a general objection with respect to the charge on the credibility of a defendant's testimony, failing either to identify specifically the basis for his objection or to suggest an appropriate alternative instruction. *See United States v. Vega,* 589 F.2d 1147 (2d Cir. 1978). The evidence against Schlesinger was overwhelming, and we find no basis for disturbing his conviction in the trial judge's failure to include a balancing instruction in the charge to the jury.

Affirmed.