UNITED STATES of America

v.

Dinesh K. CHAWLA, Defendant.

No. 79 CR 552.

United States District Court,
E. D. New York.

Jan. 17, 1980.

Edward R. Korman, U. S. Atty., E. D. N. Y., by David Kirby, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Morton Buckvar, New York City, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant, Dinesh K. Chawla, has been charged in a two-count indictment filed October 9, 1979, with attempting to import into the United States approximately 2½ kilograms of heroin, a Schedule I narcotic controlled substance, in violation of 21 U.S.C. §§ 952(a), 960, and 963, and with attempting to possess with intent to distribute the same, in violation of 21 U.S.C. §§ 841(a)(1) and 963.[1]

On October 30, 1979, defendant's counsel served and filed a motion seeking (i) to dismiss the indictment on the ground that the evidence presented to the grand jury was insufficient as a matter of law to sustain the indictment, and (ii) to suppress written and oral statements (and physical evidence flowing therefrom) made by the defendant immediately prior to his arrest and between his arrest and his arraignment. In a separate motion filed the same day, defendant also seeks to dismiss the indictment on the basis of alleged prosecutorial misconduct occurring in the office of Assistant United States Attorney David Kirby on October 24, 1979.

## I

## FACTS

The Court held a hearing on November 7, 8, and 9, 1979. The facts developed at the hearing are as follows:

Early in the afternoon of September 30, 1979, Special Agent Gerard Whitmore of the Drug Enforcement Administration ("DEA")[2] received a communication from the London office of the DEA to the effect that Her Majesty's Customs had just seized a piece of luggage found to contain a white powdery substance which had field-tested positive for heroin (Tr. 24–25).[3] Mr. Whitmore was also informed that the luggage bore British Airways baggage claim checks with the numbers 277372 and 277373 (Tr. 26), and that the airline computer had shown the owner to be the defendant Dinesh Chawla, who was holding a reservation on a Trans World Airlines flight into New York's Kennedy Airport (Tr. 26).

---

**1.** Defendant is now the subject of a superseding indictment (No. 79 CR 552–S), filed November 28, 1979. In two counts, the superseding indictment charges the defendant with knowingly and intentionally conspiring with others to violate 21 U.S.C. §§ 952(a) and 960(a)(1), and with attempting to import into the United States from England approximately 2½ kilograms of heroin, a Schedule I narcotic controlled substance, in violation of 21 U.S.C. §§ 952(a), 960, and 963.

**2.** Special Agent Whitmore was and is also a Customs Officer, designated as such by the Secretary of the Treasury. *See* fn. 9, *infra.*

**3.** References are to pages of the transcript of the suppression hearing.

As a result of this communication, Mr. Whitmore proceeded to the TWA international arrivals area at Kennedy Airport and instructed customs officials to locate and detain Mr. Chawla so Mr. Whitmore could interview him (Tr. 27, 79–80). Mr. Chawla was not aboard the TWA flight, however, and after a second conversation with the London DEA office, Mr. Whitmore learned that he would be arriving on a later British Airways flight (Tr. 27, 80). Mr. Whitmore then placed customs and immigration alerts throughout the airport for Mr. Chawla's arrival from London (Tr. 27).

A short time later, Mr. Whitmore was advised by United States customs agents that Mr. Chawla had arrived and was being held for a customs inspection, and would continue to be so held until Mr. Whitmore arrived (Tr. 30–21). Mr. Whitmore proceeded to the British Airways customs inspection point and, while Mr. Chawla's inspection was being completed, called a British customs official in London by the name of Mr. Tunstall to inform him that Mr. Chawla had been located at Kennedy Airport. At the same time, Mr. Whitmore confirmed with Mr. Tunstall the baggage claim check numbers he had been given earlier (Tr. 31). Shortly thereafter, Mr. Whitmore was advised by Customs Inspector Sykes that they were finished with Mr. Chawla. Mr. Whitmore entered the room in which Mr. Chawla was being held (Tr. 31). In the secondary customs inspection room with Mr. Chawla were two customs inspectors and Special Agent James A. Williams of the DEA[4] who entered with Mr. Whitmore; Mr. Chawla was seated about twelve feet from the only door to the room (Tr. 81–82).

Upon entering the room, Mr. Whitmore identified himself and Williams as DEA agents and asked only for Mr. Chawla's identification and airline ticket (Tr. 32, 82–83). Before Mr. Chawla responded, one of the customs inspectors handed to Mr. Whitmore Mr. Chawla's passport and certain papers relating to Mr. Chawla's customs inspection.[5] These papers confirmed the identity of Mr. Chawla (Tr. 83). Mr. Chawla himself then gave Mr. Whitmore his airline tickets, to which two baggage claim stubs were attached (Tr. 33, 83, 201). It should be noted that Mr. Whitmore did not ask for these baggage claim stubs but on receipt of same asked whether they belonged to Mr. Chawla who replied in the affirmative (Tr. 83). Mr. Whitmore then asked Mr. Chawla where his luggage was. Mr. Chawla responded that he had become separated from his luggage and that it would be arriving on a later flight. Mr. Whitmore asked whether the baggage stubs attached to his ticket were for the luggage from which he was now separated. Mr. Chawla stated that they were (Tr. 34, 83). Mr. Whitmore at some point in or at the end of these questions left the room and spoke again with British customs officer Tunstall—who had been holding open the telephone line to London during the foregoing—to confirm that the numbers on Mr. Chawla's baggage claim stubs matched those given to him earlier by the London DEA office and by Mr. Tunstall as the numbers on the pieces of luggage seized at Heathro Airport and found to contain heroin (Tr. 33, 83–84).

After his return, Mr. Whitmore advised Mr. Chawla that he was under arrest for violation of federal narcotics laws (Tr. 34, 84). Mr. Chawla started to make a verbal protest, but Mr. Whitmore stopped him and advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Tr. 42). Mr. Whitmore read those rights from a card in his possession, stopping frequently to ask if Mr. Chawla understood his rights. When Mr. Chawla responded by nodding affirmative-

---

**4.** Whitmore had radioed to Williams to meet him at the British Airways customs point immediately after he had learned from customs that Mr. Chawla had arrived. (Tr. 31, 80).

**5.** These papers included a customs declaration form, Mr. Chawla's green immigration card, and certain documents executed earlier by Mr.

Chawla in connection with the entry of some $6000 in jewelry in Mr. Chawla's possession on his arrival in the United States. These items had come into the possession of the customs inspector in the natural course of the customs process. (Tr. 33).

ly, Mr. Whitmore asked him to respond verbally. Mr. Chawla did so, stating that he did understand.[6] (Tr. 42–46).

After receiving his *Miranda* warnings, Mr. Chawla engaged in a conversation with Mr. Whitmore. Mr. Chawla inquired as to the nature of the charges against him, and Mr. Whitmore explained that he was being charged with conspiracy to import narcotics into the United States and with attempting to import the same narcotics. Mr. Chawla expressed disbelief, stating that this was an "unfortunate mistake" and that he had no knowledge of any narcotics in his luggage. Mr. Whitmore advised Mr. Chawla that the situation was no mistake, that Mr. Chawla was in a "very serious situation" and faced up to fifteen years in prison for these offenses (Tr. 46–48, 85). Mr. Chawla suggested the possibility that the travel agent in India whose job it was to deliver his luggage to the airport had placed the narcotics in the luggage to "set him up" and disgrace his family, said to be "influential in politics in India." (Tr. 47–48). Mr. Whitmore responded that a jury was unlikely to believe this story, and that he would not believe it were he a juror (Tr. 48, 85–86). Mr. Chawla then indicated that he was willing to make a statement in the DEA office at Kennedy Airport (Tr. 48).

Once at the DEA office, Mr. Chawla volunteered that he was a member of an "international heroin smuggling organization" and that he had been given the heroin in his luggage by a named individual (one C.S. or C.V. Ghandi) in India to deliver to another named individual (Joseph Holloway) in Newark, New Jersey. Mr. Chawla was to receive $100,000 for bringing the heroin into the United States and delivering it to New Jersey.[7] (Tr. 49–50). Prior to making these statements, Mr. Chawla was asked whether he remembered and understood his *Miranda* rights; he responded that he did and that he "wanted to completely cooperate to exonerate himself." (Tr. 49). Mr. Whitmore informed Mr. Chawla that the extent of any cooperation would be made known to the judge presiding over his case. He offered no guarantees, but advised Mr. Chawla that in the past judges had considered cooperation in fashioning sentences for other individuals Mr. Whitmore had arrested (Tr. 49, 86–88).

Subsequently, Mr. Chawla was transported by Mr. Williams in a DEA vehicle to the Metropolitan Correctional Center ("MCC") in Manhattan (Tr. 141). During this ride, Mr. Chawla volunteered that he had no money for a lawyer, and Mr. Williams responded that one would be appointed for him (Tr. 141, 158). The following morning, October 1, 1979, Mr. Whitmore and Mr. Williams arrived at the MCC at approximately 9:30 to bring Mr. Chawla to the courthouse in this district so that he could be arraigned (Tr. 54, 89, 141). Arriving at the courthouse at about 10:15, Mr. Whitmore proceeded to the office of the United States Attorney while Mr. Williams remained with Mr. Chawla in a temporary detention area. With the assistance of Assistant United States Attorney David Kirby, Mr. Whitmore began to prepare an affidavit in support of Mr. Chawla's arrest, to be presented to the court at his pending arraignment (Tr. 54, 92).

At approximately 11:00, Mr. Williams brought Mr. Chawla to Mr. Kirby's office to discuss further the possibility of his cooperation (Tr. 60, 94–95). Mr. Kirby again advised Mr. Chawla of his *Miranda* rights, and Mr. Chawla again indicated that he understood them (Tr. 60, 95). Mr. Kirby reiterated the importance of Mr. Chawla's cooperation. At no time during the interview did

---

**6.** At some point during this process, Mr. Whitmore asked whether Mr. Chawla, a native of India, was fluent in English. Mr. Chawla stated that he understood English, and that he had attended college and graduate school in the United States. (Tr. 84).

**7.** At Mr. Whitmore's request, Mr. Chawla began to write the substance of these oral state-

ments on paper provided by Mr. Whitmore. After writing some and "doodling" for several minutes, Mr. Chawla crumpled up the paper and threw it into a nearby waste basket. Mr. Whitmore retrieved it, initialed it, and asked Mr. Chawla to do the same, which he did (Tr. 51).

Mr. Kirby or Mr. Whitmore threaten, cajole or attempt to trick or trick the defendant into a waiver or into making any statement. Mr. Chawla responded by making substantially the same statements he had made the evening before at his arrest. In addition, he provided the telephone numbers of the individual in New Jersey to whom he was to deliver the heroin and further details about his compensation for making the delivery (Tr. 61, 63–64). Mr. Whitmore made written notes of these statements (Tr. 62, 98).

A short time later, sometime between 11:30 and 12:00, the conversation was interrupted by a telephone call to Mr. Kirby from his secretary to the effect that Mr. Chawla had an attorney waiting outside for him (Tr. 67, 100–101). Mr. Chawla indicated that this was an unexpected development, but if an attorney was available he wanted to speak with him (Tr. 67, 101). At this point, the interview was concluded and Mr. Chawla was taken to a courtroom for his arraignment (Tr. 67, 102).

## II

### DISCUSSION

In his two motions, and his Memorandum of Law and Supplemental Memorandum of Law, defendant advances essentially five arguments.

Defendant first urges this Court to dismiss the indictment because the evidence put before the grand jury was insufficient as a matter of law. Defendant alleges that: the Government failed to introduce "any conclusive evidence" that the substance seized in defendant's luggage was indeed heroin; the Government failed to produce any witness who had "tested and observed" the substance; the Government failed to introduce a sample of the substance; the Government failed to "conclusively prove" that the substance was destined for the United States for the prosecution of the defendant. Defendant's Memorandum of Law at 7.

■ We need not examine these contentions in detail, however, for the rule in this Circuit is that "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for [a] trial on the merits. The Fifth Amendment requires nothing more." *United States v. Schlesinger*, 598 F.2d 722, 726 (2d Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979), *quoting Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Further, the Supreme Court has recently stated that a "grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered." *United States v. Calandra*, 414 U.S. 338, 344–45, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). The rule applicable to defendant's motion to dismiss the indictment, therefore, is that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *Id.* at 345, 94 S.Ct. at 618. *See also United States v. Mangan*, 575 F.2d 32 (2d Cir. 1978); *United States v. Marchand*, 564 F.2d 983 (2d Cir.), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975).

■■ Defendant does not challenge the legality of the composition nor the freedom from bias of the grand jury which returned the indictment against him.[8] The only question, then, is whether the indictment is valid on its face. We find that it is. The appropriate test is "whether [the indictment] states the elements of the offense intended to be charged and adequately apprises the defendant of that which he must be prepared to meet." *United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979). *See Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The indictment here, though brief, meets

---

8. Nor has defendant made a similar challenge with respect to the superseding indictment, referred to *supra* at fn. 1.

this test: the defendant was adequately apprised of what he was charged with doing, when he was alleged to have done it, and what statutory provisions his actions are alleged to have violated.

Moreover, we have examined the grand jury minutes and find that there was sufficient evidence furnished to them to conclude that there was probable cause that the alleged crimes had been committed and that defendant committed them.

We find, therefore, that the indictment was valid on its face as a matter of law, that the evidence presented before the grand jury was sufficient, and hence deny defendant's motion to dismiss the indictment on this ground.

Defendant next moves this Court to suppress the admissions made by defendant at Kennedy Airport immediately prior to his receipt and acknowledgment of his rights under *Miranda*. These admissions consisted of his statements, made in response to Mr. Whitmore's questions, explaining that he had become separated from his luggage and that the baggage stubs attached to his airline tickets were indeed for that luggage. (See *supra* at 4). Defendant bases this part of his motion solely on *Miranda, supra,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

The thrust of these two seminal cases, taken together, is that a defendant's right to counsel and privilege against self-incrimination attach "when the process shifts from investigatory to accusatory— when its focus is on the accused and its purpose is to elicit a confession . . . ." *Escobedo, supra,* 378 U.S. at 492, 84 S.Ct. at 1766. This rule necessarily requires the suppression of all statements by a defendant "stemming from custodial interroga-

tion", *Miranda, supra,* 384 U.S. at 444, 86 S.Ct. 1602, where the prosecution has not demonstrated that procedural safeguards protecting those rights have been used. One of those procedural safeguards, of course, is the giving of the *Miranda* warnings with the concomitant acknowledgment by the defendant that he understands the rights involved.

Defendant argues that his rights attached before he made his first statements and before the warnings were given. He argues that "custody"—as that term is used in *Miranda*—began at the moment Customs Inspector Sykes said he was finished with Mr. Chawla and he was continued in the separate customs inspection room for further questioning by Mr. Whitmore. And "interrogation" is said to have begun at the moment Mr. Whitmore identified himself and Mr. Williams as DEA agents. On this basis, defendant contends that Mr. Whitmore should have advised him of his rights even before he made his preliminary inquiries about defendant's luggage, airline tickets, and baggage stubs.

We disagree with defendant's conception of when custodial interrogation commenced. We also disagree with his conclusion that he was entitled to immediate advisement of his rights. The critical fact here is that this was a border search; more specifically, this was a secondary customs search carried out by a law enforcement official executing a dual role as a DEA agent and customs officer.[9] In these roles, Mr. Whitmore enjoyed wider latitude in the constitutionally permissible treatment of this defendant than other law enforcement personnel might have in a non-customs situation. This wider latitude rendered Mr. Whitmore's conduct in the initial questioning of defendant entirely proper and free from constitutional error.

---

9. Mr. Whitmore testified at the hearing that he has explicit customs authority conferred by the Secretary of the Treasury. He had transferred from the Bureau of Customs to the DEA in 1973, at that time being designated by the Secretary as both a customs officer and a DEA agent. He retains this designation today. (Tr. 200).

Furthermore, the testimony at the hearing made clear that Mr. Whitmore's questioning of defendant commenced at a point before the customs process itself had been completed. *See* Tr. 105.

Our conclusion finds support in both statutory and case law. 19 U.S.C. § 1581 (1976), for example, authorizes customs officers to "go on board any vessel or vehicle at any place in the United States" to investigate possible customs law violations. And, more importantly, 19 U.S.C. § 1582 (1976) authorizes the Secretary of the Treasury to issue regulations governing "the search of persons and baggage" entering the United States and further mandates that "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officials or agents of the Government under such regulations." Implicit in these statutes and regulations promulgated thereunder is the premise that customs officials are empowered to detain and search persons and search and seize physical items under a standard less rigorous than the probable cause normally required in non-customs situations.

Although the Second Circuit has not yet elaborated on the precise issue presented here, a line of cases from the Ninth and Fifth Circuits offers substantial authority for our holding that defendant was not entitled to his *Miranda* warnings before Mr. Whitmore began his questioning. *See United States v. Smith*, 557 F.2d 1206, 1209–1210 (5th Cir. 1977); *United States v. Golden*, 532 F.2d 1244 (9th Cir. 1976); *United States v. Sosa*, 469 F.2d 271 (9th Cir. 1972); *United States v. Salinas*, 439 F.2d 376 (5th Cir. 1971); *Chavez-Martinez v. United States*, 407 F.2d 535, 538–39 (9th Cir. 1969).

*Chavez-Martinez v. United States, supra*, the leading case in the Ninth Circuit, is particularly persuasive. There, as here, the argument was made that the defendant became the "focus" of an accusatory process and "custodial interrogation" began at the moment the defendant was detained in the customs procedure, thereby triggering the right to receive the *Miranda* warnings. In rejecting this contention, the court cited 19 U.S.C. § 1582, *supra*, and stated that "[t]o say that by reason of such 'detention' [an individual crossing the border] is in custody, or that an investigation has focused upon him, would distort the *Miranda* rule beyond recognition." *Id.*, 407 F.2d at 539. On this

basis, the court upheld the practice of "routinely" asking introductory questions regarding a detainee's citizenship, destination, and merchandise and goods within his possession, without a prior blanket *Miranda* warning. Attaching particular importance to the fact that none of the questions involved was directed to the offense for which the defendant was later arrested and convicted, the court summarized its holding in these terms. (407 F.2d at 539):

> "[T]he warning required in *Miranda* need not be given to one who is entering the United States unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense, or the person questioned has been arrested, whether with or without probable cause. It is at this point, in border cases, that the investigation has 'focused' in the *Miranda* sense."

The facts in the case at bar fall squarely within this reasoning. Defendant's initial statements were given in response to proper introductory questions, and related solely to his ownership of and the whereabouts of his luggage. As in *Chavez-Martinez*, Mr. Whitmore did not ask at this point about narcotics in defendant's luggage or his attempt to bring narcotics into the United States. Indeed, it was only after these introductory questions—when he had established that defendant was apparently the owner of the baggage seized in London—that Mr. Whitmore had probable cause to arrest defendant. Only at that point was defendant entitled to his *Miranda* warnings, which Mr. Whitmore gave defendant as he placed him under arrest.

■ Even assuming *arguendo* that the warnings came too late, we would still find no basis for excluding defendant's responses to Mr. Whitmore's initial questions. In light of the fact that Mr. Whitmore's questions related to information already obtained from independent sources, the admission of defendant's initial statements was essentially surplusage and at worst, harmless error. *See Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972);

*United States ex rel. Dudley v. Brantley*, 461 F.2d 653 (7th Cir. 1972).

We therefore reject defendant's contention and deny that part of his motion seeking to suppress defendant's statements made prior to his receipt of the *Miranda* warnings.

■ Defendant next urges this Court to suppress statements made by defendant between the time of his arrest in the late afternoon of September 30, 1979, and his arraignment the next day approximately at noon. Defendant argues that this time period constituted delay, in violation of defendant's right to prompt arraignment pursuant to *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and their statutory counterpart in *Fed.R.Crim.P.* 5(a), and allowed Mr. Whitmore and the prosecutor to obtain admissions that would not otherwise have been made.

Without minimizing this defendant's right to a prompt arraignment, we find that the interval between arrest and arraignment was not unreasonable in the circumstances here, and that defendant's admissions in this period were freely and voluntarily made (after full *Miranda* warnings) in response to proper statements regarding the significance of his cooperation with the prosecution and the DEA. In this respect, we fully credit the Government's witnesses and find that no coercion was exerted nor threats made which rendered defendant's statements involuntary. Defendant bases his position here largely on assertions of threatening statements by Mr. Whitmore immediately following his arrest and immediately prior to his arraignment; the facts developed at the hearing, however, do not bear out these assertions. To the contrary, the record clearly indicates that defendant was advised of his rights at his arrest and again before his arraignment, and both times he responded verbally that he understood his rights. Further, at no time did defendant indicate that he wished to make no further statements until he had consulted an attorney.

We also do not find the time period involved to have been unduly long. We note that defendant's arrest occurred late in the afternoon of a Sunday, and that arraignment was accomplished within two-and-a-half to three hours of the opening of this courthouse for business the following morning. During that brief period, the Government did no more than explore the possibility of cooperation, with defendant fully aware of his rights and able to stop the conversation at any time. The Government did stop the discussion immediately upon learning that a lawyer who wished to talk to the defendant had arrived (apparently to the surprise of all concerned).

The facts here are not the same as those in *United States v. Duvall*, 537 F.2d 15 (2d Cir. 1976), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1966), where the defendant (without having been furnished food the evening before) was taken to an Assistant United States Attorney's office before arraignment the next morning and was told he was facing charges carrying "a possible sentence of a hundred years" and was led to believe that if he answered his questions the Assistant "was going to allow me to leave". In addition, the Assistant apparently cast himself in the posture of an attorney available to counsel the defendant. *Id.* at 19, 20, and fn. 11. In that case the Second Circuit sanctioned the practice of pre-arraignment interviews in the offices of the United States Attorney, without the defendant's attorney present, provided that the interviews are "conducted with strict regard for the rights of the defendant and free from any suggestions of pressure or threats." *Id.* at 24. We find that Mr. Kirby's conduct in the instant case comported with this standard.

We thus find defendant's contention to be without merit and deny that part of his motion seeking suppression of defendant's statements between arrest and arraignment.

Defendant's final two points need only be mentioned briefly. He seeks suppression of all physical evidence seized at the time of his arrest, as "fruits of the poisonous tree",

*see Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). This argument has been rendered academic, however, by our holding that no constitutional violation occurred here. And finally, defendant's separate motion alleging prosecutorial misconduct as ground for dismissal of the indictment appears to have been withdrawn. We thus make no determination on that issue.

Accordingly, defendant's motions for dismissal of the indictment and suppression of the aforementioned evidence are hereby denied.

SO ORDERED.