Matthew MASELLI

v.

John R. MANSON, Commissioner, Connecticut Department of Correction.

Civ. No. H–81–42.

United States District Court, D. Connecticut.

July 9, 1981.

John R. Williams, New Haven, Conn., for petitioner.

Linda K. Lager, Asst. State's Atty. for New Haven County, Arnold Markle, State's Atty., New Haven, Conn., for respondent.

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

CLARIE, Chief Judge.

Matthew Maselli is currently serving a term of not less than ten nor more than twenty years in the Connecticut Correctional Institution at Somers, Connecticut, after having been convicted of manslaughter in the shooting death of John Keller, which took place on December 10, 1975. Maselli has petitioned the Court for a writ of habeas corpus. His petition is based on two grounds: first, that his right to due process of law was allegedly violated by the Court's saying in its charge to the jury that his interest in the outcome of the trial was a factor to be considered in determining the credibility of his testimony; and secondly, that his right to due process of law had been violated by the manner in which the trial court instructed the jury as to how criminal intent should be determined when it is an element of the offense charged. The respondent claims that the petition should be denied on the grounds that neither of the disputed instructions violated Maselli's right to due process of law.

The Court finds that there is merit to the State's posture, and the petition for a writ of habeas corpus is denied.

### Facts

Counsel for both the plaintiff-petitioner and the respondent, the Commissioner of the Department of Correction, have agreed that this Court should adopt the statement of facts that was set out in the official opinion of the State Supreme Court, when it decided this case on direct appeal. Those agreed facts are as follows:

"In the early morning hours of December 10, 1975, the defendant shot and killed the driver of a taxicab which he had engaged to transport him from Stratford to visit a friend in Fairfield. The defendant was the only passenger in the cab and he fired eight bullets from a .32 caliber semiautomatic revolver at close range, six of which struck the victim in the head, face and neck. The taxicab, which had been traveling west on the Wilbur Cross Parkway in Woodbridge, hit a center guard rail and finally came to rest against a tree on the side of the highway. Except for a small cut and a minor abrasion, the defendant was not injured in the crash.

"The defendant claimed that he had shot the victim in self-defense as the cab was proceeding along the highway. He testified that after an evening of discussions with several associates in his business of promoting concerts and a quarrel with his girlfriend, he called a taxicab sometime after midnight in order to visit a friend who lived on route 59 near Fairfield. When the taxicab arrived, he sat in the front seat with the driver. Because commercial vehicles are not ordinarily permitted on the Merritt Parkway, the defendant said he was a policeman and, therefore, could use that highway.

"As they proceeded east on the Merritt Parkway, the victim and the defendant engaged in a conversation. Assuming that the defendant was a policeman, the victim asked if he was armed. The defendant said he had a .32 caliber automatic. The victim said he had a .44 magnum in the cab.

"After a half hour of driving easterly, the defendant noticed that they had been going in the wrong direction and had reached New Haven. The driver stopped at a phone booth and the defendant telephoned his friend and found that they should have gone westerly toward route 59 rather than easterly toward exit 59.

"After the taxicab was turned around to proceed in the opposite direction the conversation resumed. The defendant testified that the driver appeared depressed but that his own mood was optimistic. The driver said something to the effect that there was no hope for the

world. The defendant remarked, 'Only the devil talks like that.' The driver responded, 'I am the devil' and reached to his left side with his right hand to grasp what the defendant imagined was his .44 magnum. The defendant testified that when he saw the pistol in the driver's right hand pointing in his general direction, he drew his own gun, struck the driver's right hand which held the pistol and fired the entire clip of bullets in his own weapon at the victim.

"An examination of the taxicab by the police at the scene disclosed a pellet air pistol capable of firing BB shot lying near the left foot of the victim. There was testimony that the victim kept such a gun in his taxicab." *State v. Maselli*, 42 Conn.L.J. No. 7, at 15, 16 (Sup.Ct. August 12, 1980).

Maselli was indicted for murder and for a weapons violation. The two counts were severed prior to trial and in January of 1977 he was tried on the murder count. On February 4, 1977, a jury returned a verdict of guilty to the lesser included offense of manslaughter in the first degree.

Maselli appealed his conviction, alleging that the trial court had erred in instructing the jury on manslaughter when he had been indicted for murder, that the reference in the charge to the defendant's interest in the outcome of the trial infringed upon his constitutional right to testify in his own behalf, and that the instruction on how to determine intent was inconsistent with the requirements of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

The State Supreme Court affirmed Maselli's conviction. In rejecting his first claim of error, the Court held that an indictment for murder adequately notifies the defendant of any lesser included offense, and that manslaughter is a lesser included offense in a murder charge, so long as the evidence is consistent with a finding of innocent of the greater offense, but guilty

of the lesser offense. In rejecting the second claim of error, the court relied on a long line of Connecticut cases that have endorsed instructions telling the jury that they may consider the defendant's interest in the outcome of the trial as a factor in weighing the credibility of his testimony. In rejecting the third claim of error, the state court found that the presumption instruction was "adequately qualified to avoid the possible misinterpretations found objectionable in *Sandstrom*." *State v. Maselli, supra*, at 18. That court said that it was reinforced in its conclusion, that there was no possibility of jury misunderstanding due to the presumption charge, "by the fact that in this case where the defendant admitted that he intentionally fired eight bullets at the victim, causing his death, the verdict of the jury was for a conviction of the lesser offense of manslaughter in the first degree rather than murder, the sole differential element between the two crimes being the requisite mental state." *Id*., at 19.[1]

Maselli's petition for a writ of certiorari was denied on January 12, 1981. The instant petition for a writ of habeas corpus was filed on January 21, 1981.

### *Jurisdiction*

The Court has jurisdiction pursuant to 28 U.S.C. § 2254(b).

### *Discussion of Law*

■ The Court notes at the outset the great difference between direct appeal and collateral review. The fact that an appellate court might require courts subordinate to it to give or to refrain from giving a particular instruction under its supervisory power does not necessarily imply that a federal court, reviewing the same instruction in the context of a petition for a writ of habeas corpus, should rule on that instruction as an appellate court might rule. "It has ... long been settled law that an error that may justify reversal on direct

---

1.  Justice Bogdanski dissented. It was his opinion that the credibility instruction, by singling out the defendant, undermined the presumption

of innocence. *See State v. Maselli, supra*, at 19.

appeal will not necessarily support a collateral attack on a final judgment." *United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979). Consequently the burden on a habeas petitioner is a heavy one. If he bases his petition on alleged defects in the jury charge, he must show not only that the instructions in question are erroneous, but also that the errors constituted "a fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962), quoted in *Addonizio, supra,* at 185, 99 S.Ct. at 2240. Moreover, the challenged instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

■ The petitioner claims that his right to due process of law was violated when the trial judge gave the following instruction:

"Now, there is another principle of law governing, which I would like to charge you at this time as I said before, and that is the question of credibility. No fact of course is to be determined merely by the number of witnesses testifying for or against it. It is quality and not quantity of the testimony which controls.

"In weighing the testimony of a witness you consider his appearance upon the stand, you should try to size him up, you should have in mind all those little circumstances that point to his truthfulness or untruthfulness. You should consider any possible bias or prejudice he may have, his interest or lack of interest in the case or in the outcome of the trial, his opportunity and ability to observe facts correctly and to remember and relate them truly and accurately.

"You should test the evidence he or she gives by your own knowledge of human nature and of the motives which influence and control human action. If any facts are admitted or otherwise proven to you you may well bring them into rela-

tion with his testimony and see if they fit together with it.

"In short you are to bring to bear upon it the same considerations and use the same sound judgment you apply to questions of truth and veracity which are daily presenting themselves for your decision and your life in the everyday affairs of life.

"Now, with regard to this question of credibility let me say this: That as you have been apprised in the voir dire the fact that a man is an expert, the fact that a man is a police officer or state trooper doesn't mean that you have to accept his testimony merely because he's a police officer, merely because he's an expert, merely because he's a state trooper. You are to appraise his evidence under the same standard and according to the same criteria that I just read to you.

"Now, in that regard an accused person is not obligated to take the witness stand in his own behalf unless he wishes to; on the other hand he has a perfect right to take the witness stand in his own behalf—as this accused has seen fit to do. Whereas, as here, an accused person does take the witness stand to testify in his own behalf you apply to his testimony the same standards by which you determine the testimony of any other witness.

"You consider, as you will of any other witness the interest of the accused in the case, as you would consider that of any other person who has testified. In that connection you'll consider the importance to the accused of the outcome of this trial.

"In other words, what I'm trying to say is that an accused person, having taken the witness stand stands before you just like any other witness and is entitled to the same considerations and must have his testimony measured in the same way as that of any other witness, which would include your consideration of his obvious interest in the verdict." Jury Charge, at 8A–9A.[2]

---

2. The entire jury charge is appended to the State's Memorandum in Opposition to the Petition for Writ of Habeas Corpus. Each refer- ence to the charge in this ruling will cite to the page numbers of that appendix.

The petitioner argues that this instruction is in conflict with the presumption of innocence, which, he says, "must mean that an accused is entitled to have his guilt or innocence determined without jury consideration of extrinsic circumstances, namely, his interest in the outcome of the trial." Petitioner's Brief, at 9. In support of this argument the petitioner cites cases from the Supreme Court and from the Second Circuit. A careful reading of those cases reveals that they supply no support for his claim.

The petitioner first argues that *Reagan v. United States*, 157 U.S. 301, 15 S.Ct. 610, 39 L.Ed. 709 (1895), in which an instruction similar to the one given in this case was upheld, "predated the establishment of the presumption of innocence as the bedrock of our system of criminal law." Petitioner's Brief, at 8. This claim is simply wrong. The case which established the presumption of innocence as "the undoubted law" whose "enforcement lies at the foundation of the administration of our criminal law" is *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895); it was decided on March 4, 1895, exactly three weeks *before* the Court announced its decision in *Reagan*. It is, therefore, false to claim that *Reagan* predates the establishment of the presumption of innocence. The truth is that from 1895 to the present the Supreme Court has never held that an instruction on the effect that a criminal defendant's interest in the outcome of a trial may have on his credibility is inconsistent with the presumption of innocence, nor do the recent cases on the presumption of innocence give any indication that the Court is about to do so. *See Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), *Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), and *Kentucky v. Whorton*, 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979).

The petitioner also argues that recent decisions of the Second Circuit require this Court to reverse his conviction. A careful study of the cases the petitioner has cited reveals that he has misread those cases and that he has failed to appreciate the distinction between direct and collateral review.

Several times in recent years the Second Circuit has had occasion to rule on the appropriateness of credibility instructions that were more or less similar to the one given in this case. The petitioner has cited seven of those decisions.[3] In each of those cases the Circuit Court upheld the conviction that had been challenged on the basis of the credibility instruction. It is true that in some of those cases the court did express a preference for a jury charge in which the instruction on the temptation to falsify is balanced by an instruction to the effect that the defendant's interest in the outcome "is not inconsistent with the ability to render truthful testimony." *United States v. Floyd*, 555 F.2d 45, 47, n. 4 (2d Cir. 1977). *See also United States v. Rucker*, 586 F.2d 899 (2d Cir. 1978), *United States v. Schlesinger*, 598 F.2d 722 (2d Cir. 1979). In none of those cases, however, was it held that a judge who adverts in a jury charge to the effect that the defendant's interest in the outcome of the trial may have on his credibility must balance that instruction with one that reminds the jury that an interested party is capable of telling the truth.

Thus, even if the same standard of review applied in this case as applied in the Second Circuit cases cited by the petitioner, this Court would not be required to grant the petitioner the writ he seeks. The fact is, however, that the standards governing habeas review are more demanding than those governing direct appeal, and while this case is before the Court on habeas, all of the Second Circuit cases cited by the

---

**3.** The cases cited by the petitioner are: *United States v. Martin*, 525 F.2d 703 (2d Cir. 1975); *United States v. Floyd*, 555 F.2d 45 (2d Cir. 1977); *United States v. Stirling*, 571 F.2d 708 (2d Cir. 1978); *United States v. Rucker*, 586 F.2d 899 (2d Cir. 1978); *United States v. Hernandez*, 588 F.2d 346 (2d Cir. 1978); *United States v. Vega*, 589 F.2d 1147 (2d Cir. 1978); *United States v. Schlesinger*, 598 F.2d 722 (2d Cir. 1979).

petitioner involved direct appeals of convictions obtained in the federal courts. As the Court explained in *Cupp v. Naughten*, 414 U.S. 141, 145–147, 94 S.Ct. 396, 399–401, 38 L.Ed.2d 368 (1973), a circuit court, in the exercise of its supervisory power, is free to direct district courts within the circuit to refrain from giving a particular instruction simply because it is thought to be "confusing, of little positive value, or simply undesirable." *Id.*, at 146, 94 S.Ct. at 400. But even if all the circuits were to agree that this credibility instruction should not be given in the district courts, as is surely not the case, that would not warrant the reversal of a state court conviction, by a federal court considering a habeas petition predicated upon the giving of that instruction. To justify that, it must be established "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Id.*, at 146, 94 S.Ct. at 400. This the petitioner has failed to do. Accordingly, insofar as the petition is based on the claim that the instruction on the defendant's interest in the outcome of the trial violated his constitutional rights, the petition is denied.

The petitioner has also objected to a part of the trial judge's charge on how intent should be determined when the defendant's mental state is at issue. In instructing the jurors on this point, the trial judge said the following:

"The third element which must be proved is that the person causing the death of the person must have done so with intent to cause the death; in other words, the State must prove beyond a reasonable doubt that the accused shot Keller with intent to cause his death.

"Now, 'intent' is a mental process. A person's intention may be inferred from his conduct. Every person is presumed to intend the natural and necessary consequences of his acts.

"It is often impossible, and never necessary to prove criminal intent by direct evidence. Ordinarily intent can be proved only by circumstantial evidence, as I have explained that term to you. What a person's purpose or intention has been is necessarily very largely a matter of inference.

"A person may take the stand and testify directly as to what his or her purpose or intention was, and that testimony you can believe or not according to whether or not it warrants belief. But no witness can be expected to come here and testify that he looked into another person's mind and therein saw a certain purpose or intention.

"The only way which a jury can determine what a person's purpose or intention was at any given time, aside from that person's own testimony, is by determining what the person's conduct was, and what the circumstances were surrounding that conduct; and from those infer what his purpose or intention was.

"A person acts intentionally with respect to a result or to conduct described by a Statute defining an offense when his conscious objective is to cause such result or to engage in such conduct. To draw such an inference, which was mentioned heretofore in my charge, is not only the privilege but it is also the duty of the jury; provided of course the inference drawn is a reasonable one.

"In this case therefore, it will be a part of your duty to draw all reasonable inferences from the conduct of the accused in the light of the surrounding circumstances as to what purpose or intention was in his mind at various times. In order for the accused to be found guilty of the charge of murder you must find beyond a reasonable doubt that he had an intent to cause the death of John Keller.

"If you do not find beyond a reasonable doubt that the accused had that intent then he is not guilty of murder." Jury Charge, at 11A—13A.

The petitioner claims that the sentence, "Every person is presumed to intend the natural and probable consequences of his acts," renders this instruction constitutionally infirm. He claims that this sentence

unconstitutionally shifted the burden of proof on the element of intent from the state to the defendant, thereby depriving him of the presumption of innocence and of due process of law.

Both the petitioner and the respondent agree that *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), is the dispositive precedent to the petitioner's claim of error in the court's instruction. They disagree, however, on the proper interpretation of *Sandstrom* and on how it should be applied to this case. In *Sandstrom* the defendant had been charged with deliberate homicide, an offense that involves purpose or knowledge as its *mens rea*. At trial, the defendant admitted having killed the victim, but he claimed that, due to a personality disorder that had been aggravated by the consumption of alcohol, he lacked the mental state requisite to deliberate homicide. In charging the jury in the *Sandstrom* case, the trial judge, over the objection of the defendant's counsel said, "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts."

The defendant in *Sandstrom* was convicted of deliberate homicide, and his conviction was affirmed by the Supreme Court of Montana. The United States Supreme Court reversed. As the Court viewed the case, the fundamental question it presented was what kind of presumption the challenged instruction described. The Court found that a reasonable juror could have interpreted the instruction either as "an irrebutable direction by the court to find intent once convinced of the facts triggering the presumption," *Sandstrom, supra,* at 517, 99 S.Ct. at 2456, or as shifting the burden of persuasion on the element of intent to the defendant. In either case, the Court said, the State would thereby have been relieved of its *Winship* burden of proving "beyond a reasonable doubt every fact necessary to constitute the crime with which [the defendant] is charged." *In Re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). The Court therefore held the challenged instruction in *Sandstrom* to be constitutionally impermissible.

A superficial reading of *Sandstrom* might at first blush lead one to conclude that the Court proscribed the use of intent instructions that used the word "presume" and endorsed those that used the word "infer." But nothing could be further from reality than to suggest that jurors respond to these two words as professional legal scholars might: perceiving in the former a command not to inquire into intent and in the latter an invitation to do so. A more careful reading of *Sandstrom* reveals that the constitutionality of a challenged instruction is to be determined on the basis of "careful attention to the words actually spoken to the jury." 442 U.S. at 514, 99 S.Ct. at 2454. It is clear from *Sandstrom*, moreover, that reviewing courts should scrutinize the entire charge with care to see if the potential for an interpretation of a particular instruction, that would unconstitutionally relieve the state of its *Winship* burden, was removed by the rest of the charge. *See Sandstrom, supra,* at 518, n. 7, 99 S.Ct. at 2456 n. 7. As Circuit Judge Bownes said in *McInerney v. Berman*, 621 F.2d 20 (1st Cir. 1980),

> "A reasonable juror can be expected to listen to all he/she is told by the judge and it will not be presumed that he/she will not isolate a particular portion of the charge and ascribe to it more importance than the rest." *Id.*, at 24.

Scrutinizing the challenged instruction in this case, in the context of the rest of the jury charge in its totality, the Court finds that there is no likelihood that a reasonable juror could have understood the charge either as relieving the state of its burden of proof on the element of intent or as shifting the burden of persuasion on that issue to the defendant. On the contrary, the trial judge in this case not only told the jury that the presumption of innocence relieves the accused of any obligation of proving that he did not commit the crime and requires the State to prove every element of the charge beyond a reasonable doubt; he also gave the jury lengthy and detailed

instructions on how to proceed when mental processes are at issue.[4]

■ In instructing the jury on the issue of motive, for example, the trial judge said:

"Whatever motivates a man, however, rests only in his own mind; no one else can look into his mind and see what is there. Whatever was in his mind must be inferred from his conduct in light of the surrounding circumstances. The jury is entitled, indeed it is its duty to draw such inferences from a man's conduct as are reasonable inferences." Jury Charge, at 4A—5A.

This instruction clearly conveyed to any rational juror that when what was in the defendant's mind was at issue, the jury was to decide that question not by some act of divination but by the normal process of proceeding from conduct and circumstance to mental state.

■ The instruction on intent was to the same effect as was the instruction on motive. After giving the challenged instruction, the trial judge reminded the jury that intent "is necessarily very largely a matter of inference." Charge, at 12A. He went on to say that, aside from the defendant's own testimony about his intent, the only way that intent can be determined "is by determining what the person's conduct was, and what the circumstances were surrounding that conduct; and from those infer what his purpose or intention was." Id. After defining intent in terms of the "conscious objective" of the defendant, the trial judge told the jury:

"In this case therefore, it will be a part of your duty to draw all reasonable inferences from the conduct of the accused in the light of the surrounding circumstances as to what purpose or intention was in

his mind at various times. In order for the accused to be found guilty of the charge of murder you must find beyond a reasonable doubt that he had an intent to cause the death of John Keller.

"If you do not find beyond a reasonable doubt that the accused had that intent then he is not guilty of murder." Jury Charge, at 12A—13A.

Only a court that attached talismanic significance to the single use of the term "presume" in the course of the instruction on intent could find that it shifted the burden of proof to the defendant. This Court finds that whatever potential for a burden-shifting interpretation inhered in the challenged instruction was removed by the rest of the charge on intent, and that no rational juror, listening to all he was told by the judge, could have been misled by this charge.

■ The verdict actually rendered by the jury in this case confirms the Court in its conviction that the challenged instruction did not relieve the state of its *Winship* burden. In this case, the petitioner fired eight bullets from a .32 caliber revolver at the victim from close range. Six of those bullets struck the victim in the head, face, and neck, causing his death. The jury, having been instructed on the distinction between murder and the two degrees of manslaughter, decided that Maselli was guilty of manslaughter in the first degree. If the jury had understood the charge on intent in the way that the petitioner claims they might have, they would not have considered the possibility of convicting Maselli for manslaughter. Surely, the natural consequence of shooting the driver of a moving vehicle six times from close range is that the death of the victim ensue. So, if the jury had understood the word "presume" as

---

4. The presumption of innocence was the first principle of law that the trial judge explained to the jury in his charge. *See* Jury Charge, at 2A—3A. The trial judge repeatedly reminded the jury that the State had to prove every essential element of the offense beyond a reasonable doubt if it was to prevail. *See* Jury Charge, at 6A, 12A, 15A, 17A, 18A, 19A, 20A. It is true that in *Sandstrom* the Supreme Court found instructions on the presumption of inno-

cence and on the State's burden of proof to be "not rhetorically inconsistent" with a conclusive or burden shifting instruction on the element of intent. *See Sandstrom*, 442 U.S. at 518, n.7, 99 S.Ct. at 2456 n.7. What distinguishes this case from *Sandstrom* is the fact that in this case the instruction on intent, viewed in its totality, purged the challenged instruction of whatever potential for misleading the jury it possessed.

a prohibition against inquiry into the defendant's mental state or as shifting the burden to the defendant on this issue, they would have found him guilty of murder on the grounds that he presumptively intended to cause the death of the victim. In fact, however, the jury convicted the petitioner of manslaughter in the first degree, thereby confirming that they had followed the charge in its totality and had inquired into his mental state.

Thus, the conduct of the jury that convicted Maselli corroborates the Court's finding, that no rational juror could have understood the charge as requiring him conclusively or rebuttably to presume that intent had been established once the consequences of the acts were determined. The Court finds instead that the trial judge clearly informed the jury that the burden of proving intent was on the State and that, since intent is a mental process not susceptible of direct observation, it can be determined only by considering the testimony of the defendant, and by drawing reasonable inferences from his conduct in the light of the surrounding circumstances. Such an instruction is entirely consistent with the presumption of innocence and in no way violated the petitioner's right to due process of law.

Because the Court finds that the petitioner's right to due process of law was not violated by the totality of the instruction on credibility or on intent, the petition for a writ of habeas corpus is denied.

SO ORDERED.