Paul S. SHANNON

v.

John R. MANSON, Commissioner of Corrections (Raymond Lopes, Successor).

Civ. No. H–82–477.

United States District Court, D. Connecticut.

June 13, 1984.

Brian J. Wholey, Hartford, Conn., for petitioner.

Arnold M. Schwolsky, Asst. State's Atty., Hartford, Conn., Carl Schuman, Asst. State's Atty., Appellate Div., Wallingford, Conn., for respondent.

## RULING ON MAGISTRATE'S RECOMMENDED DECISION ON PETITION FOR A WRIT OF HABEAS CORPUS

CLARIE, Senior District Judge.

The petitioner Paul S. Shannon ("Shannon" or "petitioner") is currently serving a life sentence in the Connecticut Correctional Institution at Somers, Connecticut, having been found guilty by a jury of second degree murder. He was convicted almost fifteen years ago, on December 3, 1969, of the murder of Francis X. Fenton ("Officer Fenton"), an off-duty Hartford police officer. This petition comes before the Court on the recommended ruling of United States Magistrate F. Owen Eagan, filed February 6, 1984, in which the Magistrate represents to the Court that the writ should be granted on the basis of a constitutionally defective jury charge. According to the Magistrate's ruling, a portion of this charge impermissibly shifted the Government's burden of proof on the issues of intent and malice aforethought to the defendant. The Magistrate further recommends to this Court that the State of Connecticut be ordered to release the petitioner or, in the alternative, to grant him a new trial within sixty (60) days.

The State filed a timely objection to the Magistrate's recommended ruling on February 21, 1984 and requested that the Court reverse said recommendation and deny the suggested relief. Having carefully reviewed the complete, 654 page trial transcript, together with the judge's 51 page jury charge, and all other relevant memoranda and papers, the Court finds that the jury charge, taken as a whole, did not unconstitutionally create a conclusive presumption on the issue of intent or malice aforethought, or otherwise shift the burden of proof on said issues. The petitioner has suffered no prejudicial error or any lack of due process. The challenged technical defects, if any existed, were cured by other language contained in the charge. This fact becomes clear upon examination of both the context in which the challenged instructions were given and the entire charge. Moreover, even if it were to be assumed for academic reasons that the technical defects were not entirely cured by the charge read as a whole, the Court finds that, in this instance, the error was harmless in light of the facts adduced in this case.

### Jurisdiction

Shannon applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. That statute provides that a person in state custody may apply to a federal judge for relief if said petitioner claims that his custody violates either the federal Constitution, federal laws or federal treaties. 28 U.S.C. § 2254(a). This statute further provides an exhaustion requirement, which states:

"[A]n application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court shall not be granted, unless it appears that the applicant has exhausted the remedies available in the courts of the State." *Picard v. Connor,* 404 U.S.

270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

The exhaustion requirement specifies that the petitioner must have, before appearing in federal court, fairly presented to an appropriate state court the same federal claims that he wishes to present to the federal court.

■ Shannon, the petitioner here, initially filed his habeas application in the state court. After a full hearing, it was denied on August 27, 1981.[1] Subsequently, on October 30, 1981, Shannon applied to the state court for certification to the Connecticut Supreme Court. The present federal action was filed on May 13, 1982; initially, the federal proceedings were stayed to allow the petitioner enough time to return to the state court and move for certification to the State's highest appellate court. A formal denial of certification to the Connecticut Supreme Court was entered on March 11, 1983.

Both the Connecticut habeas judge and the United States Magistrate found that Shannon had not directly appealed his conviction after the original trial. However, since he was relying upon *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), a case decided ten years after his trial, Shannon's only available avenue of redress was, and remains, a collateral attack on his conviction; hence, both courts concluded that the petitioner had not deliberately by-passed the direct appeal procedure. *See Fay v. Noia,* 372 U.S. 391, 418–20, 83 S.Ct. 822, 837–39, 9 L.Ed.2d 837 (1963) and *Klein v. Harris,* 667 F.2d 274, 285–86 (2d Cir.1981). The Court finds that the petitioner has now exhausted all his state remedies and that the matter is properly before this Court.

### Facts

In order to fairly consider the legal issues raised by the petitioner relating to

---

**1.** Prior to this state petition, Shannon filed a prior petition through Attorney Ellen Lubell. In state court docket No. 240565, it is reported, "Upon a careful review of the transcript of the charge to the jury, the undersigned [Lubell] has concluded that the charge given to the jury at

petitioner's trial was free from any of the language contained in *Sandstrom* and was not illegal in any other respects." That petition was withdrawn without prejudice. Respondent's Memorandum, 7/13/83.

criminal intent and malice, it is essential to summarize the factual circumstances relating to this homicide. These facts are clear and undisputed. On March 27, 1969, at about 9:30 p.m., Officer Fenton, off duty in plain clothes, was at the Edgewood Grill on Homestead Avenue, in Hartford, talking to John R. Panchuck, the owner.

The testimony discloses that at that time, Shannon, a construction foreman, sometimes referred to as "Blackie," was very upset because he had learned that his girl friend, Lynn Franco, a married woman, was trying to break off her relationship with him. (Petitioner's Exhibit 1, Court Transcript, at 288) (hereinafter, "Tr., at ___"). Shannon had been advancing funds to pay her rent and buy groceries for her, but she seemed now not to want anything more to do with him. (Tr., at 291). He was also angry with John Panchuck because the latter had recently reneged on a promise to co-sign a loan for Shannon so that he could purchase a car. (Tr., at 325). In the past, he had borrowed a car from his friend, Martin Burke, to pick up Lynn Franco to transport her to work, take her shopping or drive over to her house in the evening. (Tr., at 321-3). Panchuck's change of heart frustrated and angered Shannon.

On the afternoon of March 27, 1969, Shannon went to the Edgewood Grill after completing his day's work. There he consumed several drinks of alcoholic beverages and competed with some other men in the barroom in playing a video type skill machine. He left there around 7:15 p.m., but returned after 9:00 p.m. During that year, 1969, Shannon had purchased a .38-caliber revolver. He had represented to others that the gun was hot (had been stolen) and that he kept it at home under the mattress. (Tr., at 297). On that evening when he went to the grill, he carried this gun in a pocket of the windbreaker jacket he was wearing.

Officer Fenton had been shopping for Easter gifts for his children that day and stopped at the grill for a drink on his way home. He lived only about four houses away. When Fenton saw the owner, Panchuck, seated at the bar, he said "I want to show you this John," referring to an Easter basket especially made for his children. (Tr., at 154-5). Officer Fenton brought over his shopping bag to show Panchuck the Easter bunny and some of the gifts he had purchased. Officer Fenton was standing alongside Panchuck, displaying the novelty of his purchases, when Shannon entered the grill. The latter proceeded to walk down to the end of the bar, where he ordered a drink. A friend of Shannon's, Robert Veilleux, paid for it. (Tr., at 261).

All of a sudden, Shannon called out to the grill owner, "Panchuck, I want you outside." Just as Panchuck started to get up from the bar stool, Officer Fenton observed a .38-caliber revolver in Shannon's right hand. Fenton, whom Shannon knew to be a police officer, advanced around Panchuck, so as to shield the latter, and asked Shannon for possession of his gun. (Tr., at 224). Officer Fenton said something to the effect of, "Let me have the gun, you don't want to use this." Shannon said, "You keep out of this you lousy cop. This is none of your business." (Tr., at 156). Shannon raised the revolver, aimed it at the officer and fired once. The officer winced, grabbed his side momentarily and dropped to the floor. (Tr., at 225-226). Shannon pointed his gun at Panchuck and said, "I want you." (Tr., at 239). Fenton hurriedly picked himself up off the floor, took off his raincoat and threw it in a booth. The officer then proceeded to approach Shannon, who backed toward a rear room. As he did so, he asked Officer Fenton, "Do you want some more?" (Tr., at 157) and pulled the trigger three times. (Tr., at 264). The gun misfired each time. As the officer came within arm's length, Shannon, holding the revolver in his right hand, pistol-whipped Fenton on the side of the face, causing the officer to reel around and fall. (Tr., at 225). At this point, Shannon fired a fifth time. Although the testimony differs as to exactly when Shannon pulled the trigger: some witnesses testifying that the fifth shot was fired after Fenton was on the floor; others that it was

fired shortly after he was pistol-whipped in the face. This final shot was the fatal shot. It hit the officer in the chest and eventually killed him. (Tr., at 233).

Officer Fenton, however, did not die the very instant that this bullet ripped into his chest. When he fell the second time, Officer Fenton's face struck the floor and he rolled over onto his side. (Tr., at 159). While Officer Fenton, now bleeding to death, struggled to get to his feet, Shannon walked over to him and said, "Shut up copper," and kicked him viciously, (Tr., at 185), expressing anger as he did so. (Tr., 194–196). When Shannon kicked Officer Fenton, he warned him, "Stay down you lousy cop." Fenton then moved no more. (Tr., at 157).

Oliver Foote, the cook and bartender at the Edgewood Grill, known as Tex, went to help Fenton. Shannon told him to get back unless he wanted to get the same thing, commenting "Tex, one more step and you're next." (Tr., 225). Shannon said, "I'm a dead duck" or "a dead pigeon, I have got one more to get. You know who." (Tr., at 185). He then instructed all present that no one should call the police, because he would come back.

At that point, Panchuck said, "Look, if you want me then let's go outside and leave these other people alone." Shannon followed Panchuck with the gun in his hand. Both of them exited. Shannon then came back in momentarily and announced, "I don't want anybody to make any phone calls or I'll shoot you." (Tr., at 290).

Shannon did not take the witness stand at his trial; rather, his defense was that he had been drinking intoxicating beverages earlier that day. As a result, he claimed that he lacked the capacity to form the requisite unlawful intent and malice aforethought to be found guilty of either first or second degree murder. This defense notwithstanding, the jury found Shannon guilty of second degree murder.

In his habeas corpus petition, Shannon claims that the trial court judge erroneously instructed the jury on the elements of unlawful intent and malice aforethought.

In his recommended ruling, the Magistrate concurred and suggested that this Court reverse the trial court and order either release or a new trial for Shannon. The Magistrate's recommendation was premised upon the theory that small fractions of the trial court's instruction on both intent and malice aforethought contained constitutional error. The purportedly unconstitutional instruction on intent states, in pertinent part:

"Where an act is perpetrated under pain of punishment, an intent on the part of one capable of entertaining an intent to act, and without justification or excuse to do the act, evidences an unlawful intent, i.e., a criminal intent. *In such a case, the existence of the intent is presumed from the commission of the act or the conduct in committing the act on the ground that the person is presumed to intend his voluntary acts, and their probable and natural consequences.*" (Plaintiff's Exhibit 2, Charge to Jury, at 27–28) (hereafter "Ch., at ___") (emphasis added).

The allegedly offensive instruction regarding malice aforethought reads, in relevant part:

"*The law presumes malice from the unlawful use of a deadly weapon,* a deadly weapon such as has been exhibited to you."

Further, this instruction states, in pertinent part:

"*Malice may be presumed from the circumstances* of atrocity, barbarism, or cruelty *attending the killing or from the unlawful use of a deadly weapon.*" (Ch., at 30) (emphasis added).

The petitioner claims here, as he did before the Magistrate, that this particular language from the charge comprised a conclusive presumption of intent or of malice aforethought, which was prejudicial to him in the jury's decision at trial.

### Discussion of Law

Shannon represents that if this Court were to apply *Sandstrom* to the trial

court's jury charge, it would render the petitioner's conviction constitutionally invalid. *Sandstrom* held that a summary jury instruction which stated, "the law presumes that a person intends the ordinary consequences of his voluntary acts" violated the defendant's right to due process and was unconstitutional. *Id.*, at 524, 99 S.Ct. at 2459. This result was based upon the finding that the jury in Sandstrom could reasonably have interpreted the challenged instruction as either (1) a conclusive presumption concerning intent, or (2) a rebuttable presumption which would have shifted the burden of persuasion on the issue of intent to the defendant. *Id.*, at 517, 99 S.Ct. at 2455. *Maselli v. Manson*, 517 F.Supp. 1183, 1190 (D.Conn.1981), *aff'd* 681 F.2d 802 (2d Cir.1981); *Arroyo v. Jones*, 685 F.2d 35, 38 (2d Cir.1982), *cert. denied*, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617. Either interpretation would have violated the Fourteenth Amendment requirement, articulated by *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that "the State prove every element of a criminal offense beyond a reasonable doubt." *Sandstrom, supra*, at 517, 99 S.Ct. at 2455.[2]

### Cure in Overall Context

█ A court reviewing a *Sandstrom* -type case must give "careful attention to the words actually spoken to the jury." *Id.*, at 514, 99 S.Ct. at 2454. These words, however, must not be examined in a vacuum. *Id.*, at 518, n. 7, 99 S.Ct. at 2456, n. 7. As the United States Supreme Court has stated:

> "In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd v. United States*, 271 U.S. 104, 107

[46 S.Ct. 442, 443, 70 L.Ed. 857] (1926). While this does not mean that an instruction by itself may never rise to the level of constitutional error, see *Cool v. United States*, 409 U.S. 100 [93 S.Ct. 354, 34 L.Ed.2d 335] (1972), it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits 'in evidence, and instruction of the jury by the judge. Thus, not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Cupp v. Naughten*, 414 U.S. 141, 147 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] (1973).

The Second Circuit has consistently followed the *Cupp* reasoning in its review of *Sandstrom* -type cases. *Rock v. Coombe*, 694 F.2d 908, 915 (2d Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 345; *Arroyo, supra*, at 39; *Ramirez v. Jones*, 683 F.2d 712, 715 (2d Cir. 1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487; *Rivera v. Coombe*, 683 F.2d 697, 700–01 (2d Cir.1982); *Nelson v. Scully*, 672 F.2d 266, 272 (2d Cir.1982), *cert. denied*, 459 U.S. 1008, 102 S.Ct. 2301, 73 L.Ed.2d 1304. In so doing, said court has considered such factors as the jury charge as a whole and the particular context from which the offensive instruction arose; (see all cites immediately preceding this sentence); the particular crime or crimes which the jury, in each case, had before it while it underwent the deliberations which ultimately led to conviction; *Rivera, supra*, at 701–02; *Ramirez, supra*, at 715–16; *Nelson, supra*, at 272; *Mancuso v. Harris*, 677 F.2d 206, 211 (2d Cir. 1982), *cert. denied*, 459 U.S. 1019, 103 S.Ct. 382, 74 L.Ed.2d 514; *Washington v. Harris*, 650 F.2d 447, 453 (2d Cir.1981), 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666;

---

**2.** Both parties concede that the legal principles of *Sandstrom* are to be applied retroactively, *citing Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977) (Respondent's Brief at 4). *See also Arroyo v. Jones*, 685 F.2d 35 (2d Cir.1982), *cert. denied*, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982); and *Ramirez v. Jones*, 683 F.2d 712 (2d Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487.

the defense or defenses raised by each applicant at trial, and how these interacted with the essential element or elements of the crime which had been allegedly, and impermissibly supplied by the burden-shifting language; *Rivera, supra,* at 701–02; *Ramirez, supra,* at 716; *Mancuso, supra,* at 210–11; *Washington, supra,* at 453–54; the fact that laypersons on the jury will not construe legal concepts as lawyers do, *Nelson, supra,* at 271; the interchangeable use of such words as "infer" and "presume"; *Brayboy v. Scully,* 695 F.2d 62, 67 n. 2 (2d Cir.1982) (Oakes, J. concurring), *cert. denied,* 460 U.S. 1055, 103 S.Ct. 1505, 75 L.Ed.2d 935; the uncontroverted facts adduced at trial; *Rivera, supra,* at 701–02; *Washington, supra;* and the timing of the offensive instruction relative to a jury's supplemental queries, the status of its deliberations, and its return of a verdict; *Arroyo, supra,* at 39–41; *Rock, supra,* at 915–16; to determine whether or not the burden-shifting proscribed by *Sandstrom* took place in a particular case.

In short, the Second Circuit has required that all relevant factors of the trial be examined as a whole, to decide whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," *Cupp, supra,* 414 U.S. at 147, 94 S.Ct. at 400, or whether the other relevant factors cured the defect of the "presumption charge there given." *Nelson, supra,* at 272. *In accord Maselli, supra,* at 1190; *Ramirez, supra,* at 715–16. These cases emphasize that the mere fact that technically erroneous language may appear in a jury charge does not mean, *ipso facto,* that a constitutional violation has occurred, but rather the erroneous language must be considered within the context of the entire trial in which it took place before a court can find that any constitutional error occurred.[3]

After reviewing the challenged language in the context of all the relevant factors in Shannon's trial transcript and jury charge, the elements of the crimes presented for the jury's consideration, compared to the offense with which Shannon was ultimately convicted, and the defenses which Shannon offered at trial, the Court finds that, although the jury instructions do contain technical deficiencies, they were cured by the remainder of the charge and by the context in which they were spoken. No reasonable jury "might have believed," after hearing the entire charge in the context of the trial, that it was " 'directed to find against defendant on the element of intent,' " or malice aforethought, or that it might shift the burden of persuasion on said issues to the defendant. *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 976, 74 L.Ed.2d 823 (1983), (Blackmun, J., plurality opinion). Furthermore, even assuming *arguendo* that a reviewing court were to find any such constitutional error which had not been cured by the surrounding context, this Court finds said error to be harmless. The Magistrate's recommended ruling therefore is vacated and Shannon's petition for a writ of habeas corpus is denied.

The challenged impermissible language occurred during the trial court's explanation to the jury of the essential elements of murder. The first part dealt with the unlawful intent necessary to commit criminal homicide. After the court had explained that "homicide is criminal or unlawful when the act or conduct proceeds from an unlawful intent, and [that] such intent exists in every case where the homicide is committed without legal excuse or justification or when it is the involuntary result of some unlawful act or conduct," Ch., at 26–27, the court proceeded to charge on the

---

**3.** This conclusion is not undermined by the United States Supreme Court's plurality opinion in *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), (Blackmun, J., plurality opinion). In *Johnson,* four justices concurred in a plurality opinion that spoke only to the narrow issue of whether or not a conclusive presumption, named as such by the trial judge, could ever result in harmless error. *Id.,* 103 S.Ct. at 971. Both the plurality opinion and the dissent recognize that the question of cure is preliminary to, and different from, the determination of whether or not a constitutional error in this context can ever be harmless. *Id.,* at 974–75 (plurality opinion at 985, n. 10 (Powell, J., dissenting).

manner in which intent could be proven. It stated as follows:

"The State is required to prove unlawful intent as a fact. It is often impossible, however, and never necessary to prove the unlawful intent by direct evidence. You cannot look into a person's mind. But the jury may infer the intent from the facts which have been proven and which, in their judgment, sufficiently evidences the intent which a person had in committing the act. An unlawful intent is sufficiently evidenced by other facts and circumstances from which no reasonable inference or other than an unlawful intent on the part of the accused can be drawn. The unlawful intent, i.e., the criminal intent, may be inferred from the acts and conduct of the accused both before, at the time of, and sometimes from the declarations made after the act which do show his intent at the time the act was committed. Where an act is perpetrated under pain of punishment, an intent on the part of one capable of entertaining an intent to act, and without justification or excuse to do the act, evidences an unlawful intent, i.e., a criminal intent. *In such a case, the existence of the intent is presumed from the commission of the act or the conduct in committing the act on the ground that the person is presumed to intend his voluntary acts, and their probable and natural consequences.* To repeat, such unlawful intent, i.e., criminal intent, exists in every case where the homicide is committed without legal excuse or justification or where it is the involuntary result of some unlawful act or conduct." *Id.*, at 27–28 (Emphasis added).

The second set of allegedly impermissible instructions took place in the context of the trial court's charge on malice aforethought. That charge reads, in relevant part:

"The fourth essential element of the crime of murder is that the killing must be done with malice aforethought. In popular speech, of course, malice means hatred, ill-will, animosity, or malevolence existing in the mind of one person to-

wards another. In the law of criminal homicide, however, malice not only embraces such a state of mind but is much broader and includes an evil design in general, a wicked and corrupt motive, and an intent to do evil which proves fatal. Malice includes all those states of mind in which a homicide is committed without legal justification, extenuation, or excuse. It is an evil design in general where the circumstances manifest a wicked, depraved, wanton, and malignant spirit.

"Malice is of two kinds, express and implied. Express, where there is a specific and deliberate intent and purpose to unlawfully kill. Where the unlawful killing is willful, deliberate and premeditated killing, it is done with express malice. Express malice may be found where the accused expresses his intent to kill the deceased, or from acts of preparation with deliberation; in coolness of execution; in present or in subsequent declarations of past purpose; and sometimes from the atrocity of the act done, provided that it satisfactorily appears from such proof that the unlawful killing was willfull, deliberate and premeditated.

*"Where the homicide is unlawful and the proof does not show it to have been willful, deliberate and premeditated, and there are no circumstances which justify, command, mitigate or extenuate it, in such a case there is implied malice from the presumption of the law.*

"In the case of unlawful homicide, even if no specific intent to kill exists and no specific feeling of hatred or ill-will exists, *still if the facts and circumstances attending the killing are the ordinary symptoms of a wicked and depraved spirit, the malice may be presumed. The law presumes malice from the unlawful use of a deadly weapon, a deadly weapon such as has been exhibited to you.* Malice, then, may be either express or implied. There is express malice where there is a specific and deliberate intent and purpose to unlawfully

kill arising out of ill-will, hatred, or animosity expressed by the slayer for his victim.

"On the other hand, there may be, as I have said, no actual malice in a sense of personal hatred, ill-will, or animosity toward the victim and no specific intent formed by the slayer to kill him, and yet *the circumstances of the killing may be such that the law will infer or imply malice therefrom.*

"I have explained to you under what circumstances and conditions this inference is or may be drawn. Such an inference, when drawn, constitutes implied malice. If malice, either express or implied, is present, then the crime is murder in some degree. *Malice may be presumed from the circumstances* of atrocity, barbarism, or cruelty *attending the killing or from the unlawful use of a deadly weapon.*

"In general, it may be said that *where an unlawful homicide is shown to be committed by an accused person and where no circumstances of mitigation, extenuation, or excuse appear, malice of the slayer will be presumed.*

"A few illustrations may be of help to you at this point.

. . . .

(illustrations omitted)

"This element of malice about which I have been speaking distinguishes the crime of murder from the lesser crime of homicide called manslaughter.

"Now, I don't want to belabor the point, but, in order to make plain to you what is not malice aforethought, let me digress for a moment. I have already told you there are some kinds of killing which the law either commands, justifies or excuses. There are also some kinds of killing which the law extenuates; for instance, where one man kills another in a transport of rage for which there has been adequate provocation in the conduct of the person killed, then the law extenuates the killing and calls it manslaughter. In the eyes of the law there is no malice

aforethought present in the mind of the killer. So, if one man catches another in the act of adultery with his wife and in a sudden transport of rage caused by seeing that, and, having no control over himself, kills the adulterer, the law says the killing is without malice aforethought and it is therefore not murder, but manslaughter.

"In the same way, if one man, not the aggressor, is subjected to a serious assault and battery by another, and because of the assault he loses control of his will and judgment and in a blind passion kills the other, then although the killing is not necessarily in self-defense, the law extenuates the killing. The law holds, in other words, that killing done under such circumstances, that is, where a man not himself an aggressor, under adequate provocation has killed in heat of uncontrollable rage or passion, such killing is extenuated and the state of the killer's mind does not constitute malice aforethought under those conditions. *From every killing of one human being by another the law implies the presence of malice aforethought on the part of a killer unless the killing is one which the law either commands, justifies, or excuses, or extenuates. So, in the present case, if there is nothing in the evidence before you which would justify you in finding that the killer of the victim by the accused, if you find he did it, was commanded, or justified, or excused, or extenuated by the law, then you will find that the killing was done with malice aforethought.* If you find all four elements present, then the crime is murder." *Id.,* at 28–33.

The underscored sentences and/or clauses contain language which is arguably constitutionally impermissible.

As pointed out in *Sandstrom,* the "threshold inquiry in ascertaining the constitutional analysis applicable to [these] kind[s] of jury instruction[s] is to determine the nature of the presumption[s they] describe[ ]." *Sandstrom, supra,* 442 U.S. at 514, 99 S.Ct. at 2454. No matter how

the Court categorizes the challenged passages cited above, they do involve the danger of impermissibly shifting the burden of proof, *id.*, at 524, 99 S.Ct. at 2459, unless their defects were cured by the context in which they were given. *Nelson, supra,* at 271–72; *Rock, supra,* at 915.

In examining the context in which these technically deficient instructions were given, the Court must examine the essential elements of the crimes before the jury, as well as the crime with which the defendant was eventually convicted, and study the interaction between the defective instructions and these elements. *Sandstrom, supra,* 442 U.S. at 520, 99 S.Ct. at 2457; *Rock, supra,* at 916, n. 7; *Nelson, supra,* at 269–73; *Rivera, supra,* at 700–02; *Mancuso, supra,* at 210–11.

At this trial, the petitioner was charged with first degree murder. Ch., at 18. State law in 1969 allowed the jury to consider the lesser included homicide crimes of second degree murder and manslaughter. Ch., at 21, 48. Both first and second degree murder required the state, at that time, to prove beyond a reasonable doubt that an unlawful killing was committed by a person in sound mind, with the mens rea of both malice aforethought, either expressed or implied, and with unlawful intent. *See generally* Conn.Gen.Stat. § 53–54 (1972), Commission Comment—1971. First degree murder required, in addition, deliberation, premeditation, and willfulness. Conn.Gen.Stat. § 53–9, *repealed by* 1969 P.A. 828, § 214, effective October 1, 1971, Conn.Gen.Stat. § 53a–54, *State v. Donahue,* 141 Conn. 656, 109 A.2d 364. Man-

slaughter differed from either degree of murder in that it did not require proof of malice aforethought. *State v. Johnson,* 139 Conn. 89, 90 A.2d 905 (1952). The trial court correctly charged the jury on the elements of each of these crimes and their differences, Ch., at 16–39, and summarized such differences succinctly and properly near the end of the charge. Ch., at 45–49.

At trial, the firing of the gun that killed Officer Fenton, was not disputed by Shannon, but he raised two defenses based upon his intoxicated condition when the crime was committed. He claimed that he was too intoxicated at the time of the shooting to either (1) form the specific intent to kill, encompassed by the requirements of willfulness, deliberateness and premeditation, necessary to have committed first degree murder, or (2) be capable of acting with malice aforethought necessary to have committed second degree murder. Ch., at 41, 42. As such, the critical issues before the jury at Shannon's trial were whether Shannon's purported intoxication prevented him from forming either (1) the specific intent to kill necessary to commit first degree murder, or (2) the malice aforethought necessary to commit second degree murder. Recognizing this, the Magistrate, *citing Ramirez, supra,* at 716, found in his recommendation that, "the presence of a *Sandstrom* violation, alone, is determinative 'where intent [is] the crucial issue ... decided by the jury ....'" Magistrate's Recommended Ruling, at 12–13. The Magistrate's construction of *Ramirez* does not reflect the reasoning of the majority of the recent decisions in this Circuit.[4]

---

**4.** In addition to *Maselli v. Manson,* 517 F.Supp. 1183 (D.Conn.1981), which was affirmed without opinion at 681 F.2d 802 (2d Cir.1981), there are at least four Second Circuit opinions in the last three years which have found that *Sandstrom*-defective jury instructions on the issue of intent were either cured, or comprised harmless error when considered in their proper context, despite the fact that in each of these cases, *either unlawful intent to kill or unlawful intent to commit serious bodily harm was both a contested issue and also a crucial, in fact an essential element of the crime of which the respective petitioner had been convicted* or which he asked to have placed before the jury. *Maselli, supra,*

517 F.Supp. at 1189–92; *Rivera, supra,* at 699–702; *Rock, supra,* at 914–917, *see especially* 916, n. 7; *Nelson, supra,* at 268–73.

The facts of this case present another reason compelling the Court not to adopt the Magistrate's construction of *Ramirez* as dispositive. As mentioned above, the crucial issues in this case are whether or not Shannon's allegedly intoxicated state impeded his ability to form either the specific intent to kill required of first degree murder or the malice aforethought required to prove second degree murder. The trial court treated these issues in its instructions at pages 40–44. At the very end of this portion

In its analysis of the effect of context on the challenged language, the Court must read the technically defective instructions as a layperson would, *Sandstrom, supra,* 442 U.S. at 514, 516–17, 99 S.Ct. at 2454, 2455–56, and must not assume legal acumen on the part of the jurors at Shannon's trial. *Nelson, supra,* at 271; *Maselli, supra,* at 1190. While legal scholars would find salient differences between the words "presume" and "infer," finding in the former a command not to inquire into ·intent [or malice aforethought] and in the latter an invitation to do so," laypersons would not. *Id.* This is particularly true in the case of petitioner's jury instructions for two reasons. One is that the instructions included no definition of presumption or inference (such as one might normally be expected to have found in a federal jury charge of that time period), which would have led a reasonable juror to distinguish between the two.[5] The other reason is that the trial court used the words "infer" or "imply" interchangeably with the word "presume" in the offensive portions of the charge (*compare* Ch., at 30, "the law presumes malice," with Ch., also at 30, "the law will infer or imply malice therefrom," and with Ch., at 33, "the law implies the presence of malice aforethought.") Such an interchangeable use of these, or similar words undermines the theory that à layperson would give one word a more conclusive

effect than the other. *Brayboy v. Scully,* 695 F.2d 62, 67 (2d Cir.1982) (Oakes, J., concurring), *cert. denied,* 460 U.S. 1055, 103 S.Ct. 1505, 75 L.Ed.2d 935 (1983). In addition, the chance of the jury's construing "presume" as more conclusive than "infer" or similar words is weakened considerably further by the trial court's use of the purportedly conclusive word "presumed" in conjunction with the obviously discretionary word, "may," in the clause "malice may be presumed," found twice on page 30 of the charge.

The Court finds that both the immediately surrounding context and the charge as a whole have cured the technical deficiencies here. First, each and every portion of defective language has been cured in its own immediate context by language which appears either just before or after it. *Mancuso, supra,* at 210. The defective "intent" instruction on pages 27–28 of the charge come on the heels of a paragraph full of language which clearly places the burden of persuasion on the State, and directs the jury to do nothing but use its own best judgment, e.g. "the State is required to prove unlawful intent as a fact;" "the jury may in[f]er the intent from the facts which have been proven and which, in their judgment sufficiently evidences [sic] the intent;" "the unlawful intent may be inferred."[6]

---

of its instructions, at page 43, the trial court charged:

"Before I leave the question of intoxication, I must again state that the fact that the accused has offered evidence on this subject does not mean that he had the burden of proof on this matter. The burden never shifts. It is on the State to prove all essential elements needed for conviction."

A Second Circuit case held that a similar expression, located in a comparable place relative to the offensive presumptive expression, had a most ameliorative effect upon the offensive words. *Nelson, supra,* at 271. This fact buttresses the Court's decision not to regard the *Sandstrom* -defective instruction on a critical issue or issues to be necessarily determinative in and of itself.

Finally, *Ramirez* undermines its own authority by paying only lip service to the *Cupp* requirement to consider the defective instruction in the context of the remainder of the charge.

In this light, *Ramirez* stands in stark contrast to *Rivera, supra,* which was released only one day earlier than *Ramirez.* While *Rivera* engaged in a very thorough examination of jury instructions which were very similar to those found in *Ramirez,* (*compare Ramirez,* at 714–15 with *Rivera,* at 699), *Ramirez'* *Cupp* examination did not runneth over one terse conclusory sentence: ··"Although the charge did also contain some instructive language which may have tended to be curative, we cannot say that, reading the charge as a whole, 'there was [no] significant possibility that harm was done.'" *Ramirez,* at 716.

5. *See* 2 Devitt and Blackmar, *Federal Jury Practice and Instructions,* § 71.04 (2d ed. 1970).

6. The Court notes, in passing, that one reading this passage as a lawyer would notice that the entire offensive portion on intent is not relevant to the matter at hand. The introduction to this

The language on page 29 of the charge which states that there is "implied malice from the presumption of the law" comes just after an instruction for the jury to examine all the circumstances for facts which might "justify, command, mitigate, or extenuate [the killing]," On page 30 of the charge, when the court instructed the jury that "the law presumes malice from the unlawful use of a deadly weapon," it also charged that "malice *may* be presumed." (Emphasis added). The discretionary nature of the language is underscored in the next two paragraphs, where the court said: (1) "I have explained to you under what circumstances and conditions this *inference is or may be drawn*. Such an inference, when drawn, constituted implied malice;" (2) "the law will *infer or imply* malice therefrom;" and (3) "malice *may* be presumed from the circumstances ... attending the killing or from the unlawful use of a deadly weapon." Ch., at 30.

Moreover, both of the "malice may be presumed" charges given here instruct the jury, as a threshold inquiry, to examine whether the use of the deadly weapon was lawful or unlawful and to examine the "circumstances of atrocity, barbarism or cruelty attending the killing." Ch., at 30. Both of these threshold inquiries refer the jury, in its decision of whether or not it will infer implied malice, to examine the totality of the circumstances and not draw a conclusive or a rebuttable, burden-shifting presumption from one or several proven facts.

In addition, all of these challenged instructions deal with the question of implied malice. (See Ch., at 29). If the jury had found express malice, as the Court believes it might well have (See "Harmless Error" section, *infra*), the instructions of implied malice would have become totally irrelevant.

Finally, the illustrations on pages 31–32 of the charge instruct the jury to examine

carefully the mens rea of the assailant in its determination of malice. The "malice of the slayer will be presumed" instruction on page 31 of the charge is similarly cured by the abovementioned factors of pages 31–32 of the charge.

On page 33, the trial court, at first blush, appears to direct the jury to find malice aforethought if it finds "nothing in the evidence before [it] to justify [the killing or to show that the killer] was commanded, justified, or excused, or extenuated." As is clear, however, this sentence, in its entirety, instructed the jury to examine *all* the evidence for proof of excuse, justification and/or extenuating circumstances before deciding the issue of malice. Moreover, the trial court used the less conclusive clause, "the law implies" malice aforethought as an introduction to this paragraph.

Thus, after examining the offensive clauses in their immediate contexts, the Court finds that other language included in proximity to the offensive clause has cured the defects therein. The offensive clauses were neither unexplained nor isolated, nor were they placed in a position of emphasis. *Rock, supra*, at 917. Rather, "whenever the presumption language was used, ... it was in the midst of a balanced statement that intent was to be determined from conduct, speech and all the circumstances," *id.*, at 916, or in the milieu of other discretionary, and thus, ameliorative language.

Furthermore, whatever presumption language remained uncured by language immediately surrounding it has been cured by the charge read as a whole. To illustrate this curative process, the Court will list the ameliorative passages, refer to that page of the charge when they came, and then cite to cases from either this District or the Second Circuit which have held that these,

"offensive" passage reads, "[W]here an act is perpetrated under pain of punishment, ...", Ch., at 27. This introduction refers clearly to the fact that this section deals solely with a particular variety of murder, felony murder, which requires, in contradistinction to other

homicide offenses, only an intent to perform the underlying act "perpetrated under pain of punishment," the felony. Thus, although somewhat superfluous and confusing, this passage is also irrelevant when read in a technical, legal sense.

or similar passages, can cure a *Sandstrom*-defective charge.

During the course of its charge, the trial court continuously instructed the jury that the State bore the burden of proving beyond a reasonable doubt each and every element of the crimes charged, Ch., at 5, 6, 8–10, 16, 19, 45, *Maselli, supra,* at 1190; *Rock, supra,* at 916; *Nelson, supra,* at 269–272, including unlawful intent, Ch., at 27, *Rivera, supra,* at 701 throughout the trial; that until the State so proved the elements of its case, the petitioner was presumed innocent, Ch., at 7–11, 18–19, *Nelson, supra, Maselli supra;* and that the burden of proof never shifted to the petitioner, Ch., at 6, 19, 43, *Nelson, supra,* at 269; *Rock, supra.* The trial court repeatedly charged the jury that it was to be the sole finder of facts, Ch., at 3–5, 10–12, 43, 44, *id.,* at 916; *Maselli, supra,* at 1190–91; in so doing, it was the jury's function to "weigh the evidence offered [and] to make the proper deductions or inferences from it," Ch., at 5, *id.;* including inferences on the subject of criminal intent, Ch., at 14, and that these inferences were to be judged by the reasonable doubt standard, Ch., at 4.

The court also charged the jury that, as part of their factfinding duty, they had to rule upon intent and malice, Ch., at 27–33, 38, *Rock, supra,* at 916, n. 7; *Rivera, supra,* at 700–01; and the effect of Shannon's intoxication thereupon, Ch., at 42. On that issue, the court further instructed the jury that in finding all the facts, including intent and malice, the jury must look to all the surrounding facts and circumstances, Ch., at 13, 16, 27, 29, 34, 39, 42, 44, *id.; Mancuso, supra,* at 210–11; *Rock, supra,* at 916; and that intent and malice are not normally susceptible of proof by direct evidence, Ch., at 14, 27, *Maselli, supra,* at 1191. These instructions on the criminal homicide offenses before the jury constituted "lengthy and detailed instructions on how to proceed when mental processes are at issue." *Id.,* at 1190–91.

The court also gave detailed instructions on the differences between the elements of manslaughter, second degree murder, and first degree murder, Ch., at 17–39, emphasizing the differences in the mens rea requirements between the three classes of crimes, Ch., at 17, 18, 20, 21, 23, 24, 27–43, and summarizing the elements of each at the very end of the charge, Ch., at 45–49; *Nelson, supra,* at 269–70, 272; *Maselli, supra,* at 1190–91.

Then, at the end of the technically offensive instructions on the crucial issues of the case, such as the specific intent to kill, malice aforethought and the effect of Shannon's purported intoxication upon his ability to formulate the necessary mens rea to establish either intent or malice, in a position considered highly significant by at least one Second Circuit case, *Nelson, supra,* at 272, the court summarized: "[t]he fact that the accused has offered evidence on this subject does not mean that he has the burden of proof on this matter. The burden of proof never shifts. It is on the State to prove all essential elements needed for conviction," Ch., at 43.

The Court finds that the sum total of all these instructions "was merely to instruct the jury as to a permissible method for reaching a conclusion as to whether [Shannon] had the intent [and malice aforethought] required to commit the [second degree murder] upon which" his conviction was premised. *Mancuso, supra,* at 211. As the Second Circuit has stated under remarkably similar factual circumstances,[7] "there was simply no possibility that after all this hammering by the judge, '[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied.'" *Nelson, supra,* at 272. This Court, like the Second Circuit in *Nelson,*

7. *Nelson* also involved a slayer who had been convicted of the second degree murder of a third party who had attempted to protect somebody from the assailant's deadly weapon, notwithstanding the slayer's interposition of a defense that he was too intoxicated to form the necessary mens rea. *Nelson, supra.*

*supra,* cannot conclude that the offending clauses, comprising a miniscule part of the charge as a whole, " 'so infected the entire trial that the resulting conviction violated due process.' " *Id., citing Cupp, supra.* The Court finds that the charge as a whole cured whatever technical defects existed therein, that the constitutional rights of the petitioner Shannon were properly safeguarded and that he was convicted as a result of a fair trial. Therefore, the Court holds that the *Sandstrom* -deficient charges at Shannon's trial were cured by the remainder of the charge read as a whole.

### Harmless Error

■ The Court further finds that, if the *Sandstrom* defects were not cured when read in context, any error remaining would be constitutionally harmless under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Chapman* held that there are "some constitutional errors which in the setting of a particular case are so unimportant and so insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.,* at 22, 87 S.Ct. at 827. In so holding, the Supreme Court recognized that some "small errors or defects," although technically unconstitutional, produced "little, if any likelihood of having changed the result of the trial." *Id.* Further, the Court held that, if the prosecution can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," then the "small errors or defects" involved can be deemed harmless. *Id.,* at 24, 87 S.Ct. at 828.

Recently, the United States Supreme Court undertook the task of deciding the question, "expressly left open" by *Sandstrom,* of whether (under *Chapman* ) a *Sandstrom* "error can ever be harmless." *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). Unfortunately, this effort resulted in a "no-decision." Four justices joined in a plurality opinion which found that "[t]here may be rare situations in which the reviewing court can be confident that a *Sandstrom* error did not play any role in the jury's verdict." *Id.,* 103 S.Ct. at 977 (Blackmun, J., plurality opinion). These "rare situations" include circumstances in which the erroneous instruction concerned only an offense of which the petitioner was acquitted and had no impact on an offense of which he was convicted, or when the defendant "conceded the issue of intent," as in cases involving self-defense, or an alibi or insanity defense. *Id.,* at 977–78. A four-justice dissent vehemently disagreed with the plurality. The dissent firmly contended that "cases in which the facts and circumstances so conclusively establish [intent] that the instruction is wholly superfluous" are susceptible of treatment as "harmless error" cases. *Id.,* at 982 (Powell, J., dissenting). The ninth justice, Justice Stevens, expressly declined to reach the merits of the case. *Id.,* at 978–79 (Stevens, J., concurring in the judgment). Chief Justice Burger wrote a separate dissent to "emphasize that the Court today does not adopt a rule requiring reversal for *Sandstrom* error, whether harmless or not, in all cases." *Id.,* at 979. (Burger, C.J., dissenting).

Very recently, the Second Circuit had the opportunity to apply the reasoning of *Connecticut v. Johnson* to a *Sandstrom* charge which resulted in a conviction of, *inter alia,* criminal possession of a weapon in the second degree. *Fournier v. Le-Fevre,* 734 F.2d 125 at 126 (2d Cir.1984). After reviewing both the plurality and the dissenting opinions in *Johnson,* the Second Circuit decided that it did not have to choose between them. *Id.,* at 128. Rather, as the petitioner conceded intent, the issue addressed by the defective charge, the Court of Appeals held that, "[w]hatever test is used, we are satisfied that ... the error arising out of the presumed intent charge was harmless and that ... Fournier was not deprived of his constitutional right to a fair trial." *Id.; see also* 128–29. Thus, the question of under what circumstances a *Sandstrom* error can be harmless appears to remain an open one in this Circuit and elsewhere.

The Court finds, under the traditional treatment of harmless error enunciated by the dissent in *Johnson,* that the facts and circumstances of this case so conclusively establish malice aforethought that the jury charge thereon was "wholly superfluous." *Johnson, supra,* 103 S.Ct. at 983. (Powell, J., dissenting). The lengthy factual record surrounding Shannon's killing of Officer Fenton discloses evidence of the existence of malice sufficient to prove beyond a reasonable doubt that any technical error which remained after the cure constituted harmless error under *Chapman, supra.*

At the time of Shannon's trial, the Connecticut courts had defined malice aforethought in this fashion:

> "Malice aforethought 'does not mean simply hatred or specific animosity, ... but it extends to and embraces generally the spirit or state of mind with which one approaches and commits a given act. It may of course be discoverable in a specific, deliberate intent to kill, but it may also be inferred or implied from circumstances which show a wanton and depraved spirit, a mind bent on mischief and evil without regard to their consequences ....'" *State v. Miller,* 154 Conn. 622, 627, 228 A.2d 136 (1967), *citations omitted.*

The Connecticut courts had held that express malice aforethought exists "where there is a specific and deliberate intent and purpose to unlawfully kill arising out of ill will, hatred or animosity expressed by the slayer for his victim," 2 Wright, *Connecticut Jury Instructions,* § 696v, (1st ed. 1960), and that implied malice exists, even in the absence of "personal hatred, ill will, or animosity toward the victim and no specific intent formed by the slayer to kill" him, when the surrounding circumstances indicate that such an inference should be drawn. *Id.,* at § 696w, x.; *Miller, supra.* These circumstances may include events which occurred directly after the killing, as well as those which happened before it. *Giannattasio v. Silano,* 115 Conn. 299, 303, 161 A. 336 (1932); *State v. Weiner,* 84 Conn. 411, 417, 80 A. 198 (1911). *See also State v. Bzdyra,* 165 Conn. 400, 405–06,

334 A.2d 917 (1973) and Ch., at 27. Under these standards, ample evidence of both express and implied malice on Shannon's part existed under the evidentiary record presented in this case.

On the day he shot Francis X. Fenton, Shannon, apparently a parolee (Tr. 306), carried into the Edgewood Grill his .38 caliber revolver, which he had removed from its customary storage place underneath his mattress, for possible use on this occasion. He also bore his anger, which had stemmed from the actions of both Lynn Franco, a woman married to another man who had recently indicated to Shannon that she was about to terminate her dating relationship with him and also John Panchuck, the owner of the Edgewood Grill, who had recently reneged on a promise to co-sign a bank loan for Shannon. Had Panchuck co-signed the loan, it would have enabled Shannon to buy a car and thus facilitate his relationship with Franco. After Shannon walked into the Edgewood Grill, he ordered a drink. Before consuming it, Shannon drew the .38 and "called out" Panchuck. Officer Fenton, then off duty, saw the gun, recognized the danger and moved toward Shannon.

As Fenton approached Shannon, shielding Panchuck and requesting the petitioner to turn the gun over to him, Shannon changed the focus of his attention and anger from Panchuck to the officer. Officer Fenton became an impediment to the free expression of Shannon's anger toward Panchuck. Shannon decided to remove this impediment. After warning Fenton, "You keep out of this, you lousy cop. This is none of your business," Shannon raised the revolver, aimed it at Officer Fenton, and fired once. Fenton momentarily dropped to the floor, clutching his side. Shannon then aimed his anger, and his pistol at Panchuck, stating, "I want you."

Shannon, however, did not then get Panchuck. Bleeding, Officer Fenton got up off the floor and advanced toward Shannon, backing him toward a room in the rear of the grill. With the free expression of his

anger toward Panchuck frustrated a second time, Shannon asked the officer, "Do you want some more"? and squeezed the trigger thrice. Luckily, each shot misfired, allowing Fenton to approach ever closer. When the officer came within arm's length of Shannon, ready to thwart Shannon from giving vent to his hostility toward its original object, Panchuck, Shannon's rage exploded at its new object. Using the pistol as a bludgeon, Shannon whipped Fenton viciously across the face and the officer fell to the floor a second time. Shannon then fired a fifth time and the ultimately fatal bullet ripped into Fenton's chest. As Fenton, vainly attempted to regain his feet, the petitioner told the officer to shut up, viciously kicked him, and warned Fenton, "Stay down, you lousy cop." After these words, Fenton moved no more.

As Fenton lay motionless and dying on the floor, the bartender, Oliver "Tex" Foote, tried to help him. Shannon threatened Foote not to assist the officer commenting, "Tex, one more step and you're next." Shannon then twice instructed all present not to call for help or else they, too, would be shot. He announced to the assemblage that he had "one more to get. You know who." Later that evening, Shannon threatened Franco by saying that he had four bullets left for all those who had hurt him. (Tr., at 406).

Under the Connecticut standards prevailing in 1969, the Court finds, beyond a reasonable doubt, that the following facts prove that Shannon killed Fenton with the explicit animosity and ill-will necessary to demonstrate express malice aforethought. Just prior to firing his first bullet into Fenton's body, Shannon called Fenton a "lousy cop." He repeated this appellation later, as Fenton lay dying. Before pulling the trigger the second, third and fourth times, Shannon asked Fenton if he wanted "some more," indicating that Shannon fully appreciated what he had done in injuring Fenton, as well as what he was about to do, i.e., pull the trigger of a loaded gun at a fellow human being three more times. When the gun misfired during the second, third and fourth shots, Shannon lashed out at Fenton with a violent pistol-whipping type blow to his face, clearly revealing animosity and hatred. As Fenton fell to the floor, Shannon aimed and fired a fifth, and fatal time. As Fenton lay bleeding to death, Shannon told him to shut up. Then, before admonishing Fenton a last time to, "Stay down, you lousy cop," Shannon drew back his foot and viciously kicked the dying Fenton. Before he left, Shannon insured that Fenton would die, by not once, but twice threatening bystanders with their own death if they tried to telephone for help.

Actions often speak louder than words. Shannon's actions here, in killing Fenton, speak eloquently to persuade this Court beyond a reasonable doubt that Shannon acted with express malice aforethought in killing Officer Fenton. The cumulative effect of his actions, when added to the words spoken by him to Fenton, is far greater than the sum of the individual acts or words themselves. To shoot one bullet at a fellow human being from point blank range is bad enough. But then, after having done such an act, to ask the injured man if he wants "some more," to pull the same trigger three additional times, to lash a cold metal pistol across the injured man's face, to shoot a fifth time, this time into the injured man's chest, to ignore his fallen condition and administer a violent kick instead of the medical help he so sorely needs, and finally to threaten anyone who might call for help with similar treatment is even worse. Taken all together, these actions and words illustrate, beyond a reasonable doubt, a wanton and malignant spirit and express malice aforethought.

The Court also finds implied malice beyond a reasonable doubt in Shannon's deliberate and calculated decision to bring his handgun, customarily kept under his bed-mattress, to the Edgewood Grill as a means by which to express and enforce his anger toward Panchuck, and subsequently toward Franco. It is clear from the surrounding circumstances that the anger Shannon felt for Panchuck was transferred to Officer Fenton when the latter prevent-

ed Shannon from reaching Panchuck to vent his spleen.

Thus, under the holding of *Chapman* and the dissent of *Johnson,* the Court finds that the facts and circumstances of this case prove, beyond a reasonable doubt, that Shannon acted with both express and implied malice aforethought in killing Officer Fenton, that, assuming *arguendo,* that any error which remained after the curative effect of the charge as a whole, had "little, if any likelihood of affecting the jury's verdict," *Johnson, supra,* 103 S.Ct. at 982 (Powell, J., dissenting) and that, any such error which did remain was therefore harmless. The Court accordingly vacates the Magistrate's recommended ruling and denies Shannon's petition for a writ of habeas corpus.

SO ORDERED.